Olga Shea, Respondent, *v.* Martin F. Shea et al., as Executors of William J. Shea, Deceased, Appellants.

Second Department, January 22, 1945.

*Frederick Evan Crane* and *Thomas E. Shea* for appellants.

*Otto C. Sommerich, Elvin N. Edwards* and *John J. Delaney* for respondent.

Adel, J. The issue is whether or not the marriage in suit is valid in law in New York State; and the conclusion depends

upon whether or not the marriage is affected by section 11 of the Domestic Relations Law, as amended by chapter 606 of the Laws of 1933.

The parties to the marriage were at all relevant times residents of the State of New York. The woman is plaintiff. The man is dead and defendants are the executors named in his will. The action is for a judgment declaring that the plaintiff was the wife and is now the widow of the deceased. After a lengthy trial before the court, without a jury, judgment has been granted in favor of plaintiff, as demanded in the complaint.

The plaintiff and the decedent met in 1934 at a time when she was still the wife of another man. In January, 1935, she obtained, in Illinois, a decree of divorce from her husband. Since that date, and apparently before, and until the death of defendants' intestate in 1940, the plaintiff and the intestate lived together in the same household in New York, acknowledged themselves to be man and wife to friends and relatives, and in many other ways conducted themselves as formally married couples usually do. During that five-year period the couple made frequent visits to places outside this State where common-law marriages are valid; and there, too, they made repeated acknowledgments of their marriage; registered and stayed at hotels as " Mr. and Mrs.," and the like. On at least one occasion in New York they stated that they had been married outside the State. At no time and at no place, however, did they participate in a marriage solemnization as required by the provisions of section 11 of the Domestic Relations Law. The void caused by the lack of proof usually relied on in these cases, that is, testimony of one of the parties, or of a witness, to the exchange of promises, is sought to be filled by proof of the creation of the status without the State in jurisdictions where such marriages are valid, together with evidence in support or corroboration thereof by proof of cohabitation and reputation within the State. There is evidence in the record which shows that the plaintiff used a name which under ordinary custom does not indicate that she was the wife of the decedent, and that the decedent made public record reports in which he styled himself as single or unmarried. But if the evidence which relates to the conduct of the parties within the State is given credence and considered. the cumulative mass with respect to acknowledgment of marriage by the parties themselves, reputation, and the like, in and out of the State, is of such weight as to fully justify, in my opinion, the finding that the parties consented to be husband and wife and that a marriage existed under common-law concepts.

Common-law marriages are not valid in New York State, however. (Domestic Relations Law, § 11 as amd. by L. 1933, ch. 606.) To the familiar elements necessary to establish a common-law marriage our statute has added the element of solemnization; and thus it seems that a marriage, otherwise valid, is not valid here unless it has been solemnized by one of the means stated in the statute. It would seem that the Legislature has taken an element which has been otherwise recognized as formal and promoted it to a position of substantive importance. It can hardly be doubted that such is the purpose and intent of the statute insofar as marriages entered into in New York State are concerned. Here the problem is involved, in that proof of acknowledgments and conduct of the parties in territorial jurisdictions where common-law marriages are valid is sought to be bolstered and supported by proof of like conduct of the parties within the State, presenting the question of whether the two phases of proof, taken together, are sufficient to persuade the courts of this State, despite the local statute, to recognize the validity of the marriage alleged to have been so erected by two residents of this State. The answer to the question is not free from doubt. The statute states, " No marriage shall be valid unless solemnized by either: " and then follows a list of clerics, public officials, and a description and means of executing a written agreement.

From some earlier decisions it is easy to conclude that two residents of New York, who could not enter into a valid common-law marriage here, might go to another State where such marriages are valid, enter into such a contract, return here, and have the marriage recognized as valid even though the trip was made specifically to accomplish that result. (*Matter of Seymour,* 113 Misc. 421; *Matter of Burke,* 143 Misc. 268.) Those decisions were made, however, under an earlier statute affecting the solemnization of marriages in this State. That statute was in force from 1902 to 1907, inclusive (former Domestic Relations Law, § 19, added by L. 1901, ch. 339, § 6, and repealed by L. 1907, ch. 742). Section 6 of the 1901 statute contained the following language: " * * * § 19. No marriage claimed to have been contracted on or after the first day of January, nineteen hundred and two, *within this state,* otherwise than in this article provided, shall be valid for any purpose whatever, * * *." (Italics mine.) No similar provision appears in the present article 3 of the Domestic Relations Law. The words of section 11 of the Domestic Relations Law, as amended by the 1901 statute, and as presently constituted,

must be compared. By the earlier statute it was provided, "A marriage must be solemnized by either: * * * ." In the statute applicable here (*supra*), it is provided, "No marriage shall be valid unless solemnized by either: * * * ."

The earlier statute was held to be regulatory of the means of solemnization of marriages but not entirely to govern their validity. (*Matter of Ziegler* v. *Cassidy's Sons*, 220 N. Y. 98.) Because of the difference in wording of the present statute it would seem to be reasonably clear that the Legislature intended to affect the validity of a marriage not solemnized as provided by the present statute. Literally construed, the phrase, "no marriage shall be valid unless solemnized" as described, has no territorial limits, and it could be applied to any nonceremonial marriage contracted outside the State. I do not believe, however, that the Legislature intended to go that far. New York could not define the forms of solemnization in foreign jurisdictions that must be followed to give validity to a marriage. But New York can define by statute what marriages it will recognize as valid, regardless of their validity elsewhere; and this is particularly so when concerned with its citizens. Such use of power presents no issue of full faith and credit, although the principle of comity may be applicable. Under that principle, however, this State may say whether or not it will recognize a marriage of its residents, valid in its place of inception, if it was not solemnized by one of the means prescribed as an element of validity. There would be a different question to consider if we were concerned with persons validly domiciled in a common-law jurisdiction at the time of entering into the contract.

On the matter of statutory construction, I should say that the intention of our present statute is to hold invalid a marriage between residents of our State which took place in a common-law jurisdiction by means of connubial conduct of the parties during brief sojourns there. I conclude that our public policy, as expressed in the statute and clarified by the history of the statute, requires that result. The same result might be reached upon strictly legalistic reasoning. Thus, in the legal concept, marriage in its narrowest form is a civil contract. (Domestic Relations Law, § 10.) The parties to this marriage were at all times residents of New York. If it must be found that they entered into a contract in a foreign jurisdiction, it could easily be found that the contract called for performance in New York State where performance is invalid. However, it is not necessary to rely upon such reasoning to reach a conclusion

here.   The judgment declares that the plaintiff-respondent was the wife and is now the widow of the deceased.   It should be reversed on the law, with costs, and defendants-appellants' motion for judgment should be granted, as demanded in the answer, with costs.

The findings of fact, that the parties intermarried in valid common-law form and in common-law jurisdictions, should, in my opinion, be affirmed; but the conclusions of law, that the marriage is valid in New York State, should be disapproved for the reasons stated in this opinion.

If the conclusion that the marriage has no local validity is erroneous, the judgment in favor of the plaintiff-respondent should not be affirmed but a new trial should be granted because of the error committed in excluding the testimony of close relatives of the appellants.   The Special Term held that a son of one of the appellants was interested in the event within the meaning of section 347 of the Civil Practice Act, and, therefore, could not testify to transactions or conversations had with the decedent.   The same ruling was made when the defendants offered the wife of one of the appellants as a witness.   Neither of those persons is named as a beneficiary in the will.   They are not interested in the event within the meaning of section 347, and are not barred as witnesses, nor is their testimony incompetent on that ground.

JOHNSTON, J. (dissenting in part).   I concur for reversal of the judgment, but dissent from dismissal of the complaint and vote to grant a new trial solely because the court refused to permit the son of defendant Martin F. Shea and the nephew of decedent, to testify as to what transpired when he visited decedent at Atlantic Beach where, as shown by independent testimony, the decedent and plaintiff resided in the same house.   While the question propounded to the witness may have been improper in form (there was no objection on that ground) and technical procedure may have required defendants to present their evidence for rulings thereupon, the court held that the witness was incompetent to testify under section 347 of the Civil Practice Act. The court made the same ruling when defendants offered to call as a witness the wife of defendant Martin F. Shea.   Neither the witness nor the proposed witness had a " financial interest in the event of the litigation which would be supported and forwarded " by their testimony " so that if permitted to give it she [they] would be testifying in her [their] own behalf or interest." (*Harrington* v. *Schiller*, 231 N. Y. 278, 285.)   Under the circum-

stances, the exceptions to the rulings were well taken and require reversal.

Even though it be assumed that the relationship between plaintiff and decedent was illicit in its inception, the proof not only justified but compelled the findings of the learned Special Term that in 1935 — when each had legal capacity to marry — the decedent and plaintiff entered into a valid common-law marriage outside the State of New York, and thereafter and up to the death of decedent in 1940 they continuously cohabited. That such common-law marriage took place outside the State of New York was established by clear and convincing evidence and was corroborated by reputable and disinterested witnesses, who testified that at divers times and places, without as well as within the State of New York, decedent, both in the absence and presence of plaintiff, made admissions to that effect. It also appeared from the testimony of the same witnesses that thereafter the parties, without as well as within the State of New York, lived together and held themselves out as husband and wife and were accepted and recognized as such by relatives and friends, at whose homes they visited and who visited them at their home. The declarations of decedent and his conduct toward plaintiff and their continued course and habit of living confirm the testimony adduced and, together with the other evidence, sustain the finding that plaintiff was the wife and is the widow of decedent. In so concluding I am not unmindful of the testimony offered by appellants showing acts on the part of decedent and plaintiff inconsistent with her claim. It appeared that decedent, when registering to vote in Manhattan, declared he was single, and plaintiff, when voting at Atlantic Beach, did so as " Olga D. Lennox; " that decedent in his State and Federal income tax returns reported himself as single; that plaintiff's telephone was listed and her automobile registered in the name of " Olga D. Lennox." While plaintiff was known to her business associates as Olga Lennox, she and decedent were known to their friends, neighbors and others as Mr. and Mrs. Shea. The fact that the parties at times acted inconsistently and made inconsistent declarations does not destroy the status of a common-law marriage. (*Dodge* v. *Campbell*, 135 Misc. 644, affd. 229 App. Div. 534, 255 N. Y. 622.) Such proof is to be weighed together with the other evidence by the trier of the facts in determining whether a common-law marriage existed.

There is another fact of probative value which may be emphasized. It has been held that the failure of an alleged widow to

assert her rights immediately following her alleged husband's death is strong evidence that she had no rights to assert. (*Matter of Brush,* 25 App. Div. 610, 619.) I take it the converse is equally true. It appears from the testimony of Mr. John T. Clancy, a well-known member of the Bar and secretary of the Queens County Bar Association, that on the day decedent died he was requested to attend at decedent's home, where he met plaintiff and decedent's brothers, the appellants, one of whom is the attorney of record. Plaintiff, in the presence of appellants, then informed Mr. Clancy she had brought decedent to the city early that morning to consult a physician; that meanwhile she had summoned a priest, and shortly thereafter decedent died. It also was shown that when decedent's death appeared imminent she called in appellants. Mr. Clancy further testified that later, on the same day, appellants told him that elderly relatives and members of religious orders were expected and they felt, in view of the past relations with the family, it would be better if plaintiff were away. They requested Mr. Clancy's aid so to persuade her. He replied that, inasmuch as plaintiff was decedent's wife and had been with him for five or six years, the request was unreasonable. Plaintiff remained at the home until after the funeral, when she was requested by appellants to leave, and she continued to assert her rights as widow.

We are reminded that "The validity of any alleged common-law marriage is always open to suspicion. Especially is doubt justified when one of the parties is dead." (*Boyd* v. *Boyd,* 252 N. Y. 422, 428.) But in the same case the court also said: "This natural suspicion must, however, be dispelled when testimony, if reasonably believed, proves the existence of circumstances inconsistent with the absence of the alleged marriage."

Each case must be decided on its own facts. This is not an instance where a young and designing woman was imposing on a senile and weak man. Plaintiff is a matured woman and for many years has had a responsible position, with a substantial salary. Decedent also was mature and a man of religious convictions and substantial means. It is claimed he died possessed of personal property valued at more than $600,000.

True, death has sealed the lips of the decedent, but the statute has sealed the lips of the plaintiff. It also should be remembered that the Court of Appeals has said: "The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. * * * 'The presumption of law is not lightly to be repelled. It is not to be broken in upon, or shaken by a mere balance of probability.

The evidence for the purpose of repelling it must be strong, distinct, satisfactory and conclusive.' * * * The presumption could be negatived only ' by disproving every reasonable possibility.' '' (*Hynes* v. *McDermott*, 91 N. Y. 451, 459.)

Four members of this court share the view of the Trial Justice that the relationship between the parties was that of husband and wife. However, as three justices favor dismissal of plaintiff's complaint — but for different reasons — the fate of plaintiff's action depends upon the soundness of the proposition raised in Mr. Justice ADEL's opinion, in which Mr. Justice HAGARTY concurs. It will be noted that proposition was not urged by appellants' distinguished counsel and it is unsupported by the citation of authority.

Upon the facts disclosed by this record, there is, in my opinion, no legal basis for the conclusion of Mr. Justice ADEL that the common-law marriage of the parties outside the State of New York, which marriage was valid where made, is invalid in the State of New York.

This view gives effect to the general rule that marriage contracts valid where made are valid everywhere, " unless they are contrary to the prohibition of natural laws, *or to the express provisions* of our statute." (*Cunningham* v. *Cunningham*, 206 N. Y. 341, 348; *Thorp* v. *Thorp*, 90 N. Y. 602; *Van Voorhis* v. *Brintnall et al.*, 86 N. Y. 18; *Matter of Seymour*, 113 Misc. 421.) It is not suggested that the marriage in the case at bar was polygamous or incestuous, and while the court did not expressly so find, it is not disputed that the parties had legal capacity to marry. I know of no express provision in any statute of this State making invalid here a marriage contract valid in a foreign jurisdiction, even though such marriage would be unlawful if contracted in this State.

Section 8 of the Domestic Relations Law forbids a husband or wife who has been divorced in this State on the ground of his or her adultery to remarry during the lifetime of the complainant, except by permission of the court, and if he or she does remarry in this State, the second marriage is void. (Domestic Relations Law, § 6; *Merrick* v. *Merrick*, 266 N. Y. 120; *Matter of Sokoloff*, 166 Misc. 403; *Thorp* v. *Thorp, supra; Matter of Seymour, supra; Gardner* v. *Gardner*, 98 Misc. 411; *Roth* v. *Roth*, 97 Misc. 136; *Heidig* v. *Heidig*, 6 N. Y. S. 2d 405, 406, not officially published.) But if such divorced person remarries in another State (the decree adjudging that it shall be unlawful for him to marry during the lifetime of the complainant), such remarriage, if valid in that State, is unimpeachable here and

must be recognized as a lawful marriage by the courts of this State. This is so because the inhibitory provisions of the statute have no extra-territorial force but " are limited in their effects to the State creating them." (1 Bishop on Marriage, Divorce and Separation, § 869; *Fisher* v. *Fisher,* 250 N. Y. 313, 318; *Moore* v. *Hegeman,* 92 N. Y. 521.) The same rule applies, and for the same reason, where both parties, domiciled in this State, leave it for the purpose of evading its laws and enter into a common-law marriage in a State where such marriage is lawful and then immediately return to this State; and this notwithstanding the prohibition in our statute and the decree. (*Matter of Garner,* 59 Misc. 116, 124, and cases cited.)

As I understand the opinion, my brother ADEL holds that a common-law marriage between residents of this State, though valid where made, is not valid in this State perforce the provisions of section 11 of the Domestic Relations Law. That statute provides that no marriage shall be valid unless solemnized by one of the persons or officials specified or by a contract executed in a prescribed manner.

" The right of a government, as well as that of the several States   *   *   *   to determine the marital status of its own citizens and prescribe the terms and conditions upon which their relations may be changed is elementary and beyond question." (*Cunningham* v. *Cunningham, supra,* p. 347; *Van Voorhis* v. *Brintnall, supra; Earle* v. *Earle,* 141 App. Div. 611; *Matter of Seymour, supra; Maynard* v. *Hill,* 125 U. S. 190; *Meister* v. *Moore,* 96 U. S. 76.) To put it more succinctly, " *   *   *   any one of our States may validly, however unwisely, ordain *by express terms* in a statute that the marriages of its citizens outside of its territory shall be void if in non-compliance with rules which itself prescribes." (Italics mine.) (1 Bishop on Marriage, Divorce and Separation, § 883.)

While there may be others, there is at least one instance where a State Legislature has exercised such right. Two residents of Massachusetts, a mulatto and a white woman, went to Rhode Island and were married " according to the laws of that province " and returned immediately to their home. At that time Massachusetts had a statute prohibiting all such marriages. The Massachusetts court applied the principle that a marriage good in the country where made is good in any other country even where it appears that the parties went out of their State to evade its laws. (*Medway* v. *Needham,* 16 Mass. 157.) Subsequently the Legislature passed an act providing, in substance, that where citizens of Massachusetts, for the purpose of evading

its laws, go into another State or country and there have their marriage solemnized, and afterward return and reside in the home State, the marriage shall be void in that State. Later the court, speaking of that statute, said its object was " to enforce the observance of our own laws upon our own citizens, and not to suffer them to violate regulations founded in a just regard to good morals and sound policy." (*Sutton* v. *Warren,* 10 Metc. [Mass.] 451, 453.)

Therefore, our Legislature having ordained that common-law marriages are not valid when contracted within the State, also could have declared that such marriages, contracted by our citizens without the State, likewise are unlawful. The Legislature having the power, the remaining question is: Did it exercise it by amending section 11 of the Domestic Relations Law? I think not. As heretofore indicated, that statute merely specifies by whom and in what manner a marriage to be valid must be solemnized in this State. It has no extraterritorial force, for " all laws are co-extensive, and only co-extensive, with the political jurisdiction of the lawmaking power; and every statute in general terms is construed as having no extraterritorial effect." (McKinney's Cons. Laws of N. Y., Book 1, Statutes [1942 ed.], § 149, and cases cited.)

In *Matter of Ziegler* v. *Cassidy's Sons* (220 N. Y. 98, 103) Chief Judge HISCOCK, speaking of a statute (L. 1901, ch. 339, one of the forerunners of § 11) entitled " How a marriage must be solemnized," stated: " I think that the great weight of authority is to the effect that such a statute will be regarded as directory or as prescribing the essential requirements of a formal solemnization of a marriage such as may be necessary to secure the benefits of registry, etc., and will not be regarded as invalidating a form of marriage contract otherwise valid, in the absence of some provision *expressly declaring or necessarily implying that result.*" Chief Judge HISCOCK then adopts the following rule laid down by the United States Supreme Court (*Meister* v. *Moore, supra,* p. 79) in construing a statute of like tenor: " No doubt, a statute may take away a common-law right; but there is always a presumption that the legislature has no such intention, *unless it be plainly expressed.* A statute may declare that no marriages shall be valid unless they are solemnized in a prescribed manner; * * *. Whatever directions they may give respecting its formation or solemnization, courts have usually held a marriage good at common law to be good notwithstanding the statutes, *unless they contain express words of nullity.*" (Italics mine.) Concededly section 11

of the Domestic Relations Law contains no express words of nullity.

Mr. Justice ADEL states that "Literally construed," the statute "has no territorial limits, and it could be applied to any nonceremonial marriage contracted outside the State." He does not believe, however, that the Legislature intended to go that far. Nevertheless, while admitting that plaintiff and decedent contracted a valid common-law or "nonceremonial" marriage outside the State, he construes the statute as precluding our courts from recognizing it as valid. I believe that if the Legislature "deems it wise and best to affix the stamp of illegality upon every marriage contracted or solemnized otherwise than in accordance with the strict letter of the statute that purpose should be made plain and unmistakable. The courts ought not to be asked to pronounce marriages invalid and children illegitimate under a statute unless it has plainly decreed and foretold those consequences, and people ought not to be penalized in such matters as those by adoption of guesswork and conjecture as a method of statutory interpretation by which to accomplish such result." (*Matter of Ziegler* v. *Cassidy's Sons, supra,* p. 110.)

Mr. Bishop states the applicable rule, section 867: "If a statute of our own State, silent as to marriages abroad, * * * declares void all marriages not celebrated in compliance with prescribed forms, it has no effect upon marriages even of our own citizens entered into out of the State; those marriages are to be judged of by our courts precisely as though the statute did not exist. If they are valid by the international law of marriage, and by the local law where celebrated, they are so also by our own law,— the statute having nothing to do with the question. For the international law of marriage is a part of the unwritten law of our State, and a written law not interpreted to be extra-territorial does not change the unwritten as to extra-territorial marriages."

Hence, I conclude that, in the absence of express terms, the statute may not be regarded as invalidating a form of marriage contract otherwise valid. The reason for the rule is patent. "If the citizen is to be held bound by the laws of his State for acts performed by him outside its limits," the Legislature must do so expressly. (*Van Voorhis* v. *Brintnall,* 86 N. Y., *supra,* pp. 34-35.)

It is also suggested by Mr. Justice ADEL that because the former statute (L. 1901, ch. 339, § 6) contained the words "within this state," and those words are absent from the pres-

ent statute (§ 11), that justifies an "inference that the Legislature intended to affect the validity of a marriage not solemnized as provided by the present statute." It will be noted that it was the former statute which was considered in *Matter of Ziegler* v. *Cassidy's Sons* (*supra*). The words "within this state" in the former statute were mere surplusage. It cannot be assumed that the Legislature, by eliminating them from the latter statute intended to revolutionize the law so firmly established by precedent that it has become a tradition.

It is further suggested that "our public policy, as expressed in the statute" requires that a common-law marriage contracted out of our State by residents thereof be held invalid. The question before us is not one of public policy but statutory construction. But if the case is to be decided on a question of public policy, we are not without authority as to what is, and for nearly a century has been, the controlling public policy. It was declared by the highest court in this State and the highest court in Massachusetts.

In *Haviland* v. *Halstead* (34 N. Y. 643, 647) the court said: "The doctrine that a marriage is to be held valid or otherwise, according to the laws of the place where it is contracted, although the parties went to the foreign country with an intention to evade the laws of their own, is an exception to the general principle of law relating to contracts, that a fraudulent evasion of the laws of the country where the parties have their domicile, will not be upheld. The exception in favor of marriages so contracted is founded on principles of policy, to prevent the great inconvenience and cruelty of bastardizing the issue of such marriages, and to avoid the public mischief which would result from the loose state in which people so situated would live. (*Medway* v. *Needham*, 16 Mass. 157, per PARKER, Ch. J.)"

The judgment should be reversed on the law and a new trial granted.

LEWIS, J. I agree with Mr. Justice JOHNSTON that section 347 of the Civil Practice Act was erroneously held to bar certain proof; and that a common-law marriage, if valid where contracted, is valid in this State. However, I concur for reversal of the judgment and dismissal of the complaint on the ground that the documentary and other evidence disproves the existence of a common-law marriage.

HAGARTY, J., concurs with ADEL, J.; LEWIS, J., concurs in memorandum for reversal and dismissal of the complaint on

the ground that the documentary and other evidence disproves the existence of a common-law marriage; JOHNSTON, J., votes to reverse the judgment and to grant a new trial in opinion in which CLOSE, P. J., concurs.

Judgment reversed on the law, with costs, and judgment directed for appellants, as demanded in the answer, with costs. Findings of fact affirmed. Conclusions of law disapproved and not allowed. If the merits did not require reversal and dismissal, a new trial would be granted by reason of the errors in excluding testimony of close relatives of the appellants on the ground that it was barred by section 347 of the Civil Practice Act.