OPINION OF THE COURT
John P. Dunne, J.
In this action for wrongful death and medical malpractice, the limited issue presented on the motion and cross motion is whether, under principles of full faith and credit or comity, *441 plaintiff John Langan’s legal status as a spouse of Neal Spice-handler in a civil union solemnized in the State of Vermont, which union is sanctioned and affords all benefits and obligations of marriage under the laws of Vermont, entitles him to recognition as a “spouse” under New York’s wrongful death statute. Plaintiff does not raise any derivative claim for loss of consortium.
As background for analysis, the circumstances of Neal Spice-handler’s death, as well as the circumstances of his life are reviewed.
Neal Conrad Spicehandler and John Langan met on November 1, 1986 when Spicehandler was 26 and Langan was 25. They moved in together eight months later and lived together until Spicehandler’s death at age 41. They provided each other with health care proxies, each was the sole beneficiary on the other’s life insurance policy, they were joint owners on homeowner’s insurance, and were the sole legatees under each other’s wills.
In the year 2000, Vermont enacted a statute which legally sanctioned homosexual unions in the same manner as a marriage. The civil union required the same solemnization as a marriage and created spouses for all purposes under Vermont state law. Within four months of its passage, Spicehandler and Langan, in a formal ceremony with approximately 40 family members and friends attending, were joined in a union solemnized by a justice of the peace. Their vows included taking each other “to be my spouse.” They exchanged wedding bands, they planned to adopt children, and finally purchased a house in Massapequa, Long Island. Within hours of the closing Neal Spicehandler was struck by the automobile driven by Ronald Popadich who ran down and injured 18 people in Manhattan. He was taken to St. Vincent’s Hospital with a broken leg, and underwent two surgeries. He died while in the hospital from an embolus of “unknown origin.”
Neal Conrad Spicehandler was known as both Neal and Conrad. He is referred to as both by different family members and friends as they describe the nature of his relationship with plaintiff. Their words are telling. First, the parents. Ruth Spice-handler, Neal’s mother, knew John Langan as her son’s partner for 16 years, and even her grandchildren know John as an uncle. She explains, “John has been Neal’s partner in all aspects of life.” They participated together “in all family functions” including “birthdays, anniversaries, religious events, holidays, dinners, and vacations.” Plaintiff’s parents, Daniel *442 and Barbara Langan, worried that their son would face “prejudice, hostility and other difficulties” and initially did not accept his relationship with Spicehandler. But they changed, stating, “John has always loved life, but we believe he loved Conrad even more. It is as if a part of him died when Conrad died.”
Jeremy Spicehandler, Neal’s brother, says of plaintiff, “I * * * think of him and care for him as a family member * * He relates how John had been a source of strength when his father died, and how he and Neal, knowing it would be difficult for his mother, held the holiday Seders at their home in Massapequa, Long Island. “It was a difficult time for everyone, made easier by being in their loving home.” Elliot Spicehandler, another brother, states that the civil union was important to Neal because of his “interest in adopting children.”
There are additional affidavits from family. A sister-in-law, Laura Spicehandler, stated, “There was never a time in all those 16 years when it was just Neal, or just John. It was always Neal and John, together, spouses * * * as inseparable as any married couple could possibly be.” The affidavits of other family members, cousins, aunts, godmother, echo these sentiments. Cousin Kim Marie Merritt sums up their loss, stating that since Neal’s loss John “is still working to put one foot in front of the other * * * We are all working to put our lives back together after losing a beloved family member so young, so suddenly.”
Friends of Langan and Spicehandler have come forward to provide evidence of their relationship. Alan Matzkin tells of Neal’s sacrifice for John in the spring of 1998 when Neal temporarily set aside his legal career ambitions “to help John improve his career prospects and the value of his business.” Nancy M. Starznski, one of the many friends and business associates submitting affidavits, and a college friend who often celebrated family events and holidays together with John and Neal, says, “David and I are heartbroken that this affidavit is necessary to quantify the union between these two wonderful people. Their love for each other was so strong * *
New York does not compensate a spouse for spiritual or emotional loss, but it may compensate Langan for his pecuniary loss if it is determined that he is a spouse for purposes of the wrongful death statute. There is no infirmity of proof on the factual issues. The evidence offered establishes that John Langan and Neal Conrad Spicehandler lived together as spouses from shortly after they met in 1985 until the year 2000, when they took the first opportunity to secure legal rec *443 ognition of their union in the State of Vermont, and were joined legally as lawful spouses.
Under New York law as it now stands, if Langan were a registered domestic partner, he would be able to succeed to a rent-controlled apartment as a “family member,” would be able to recover had his partner been lost in the September 11 tragedy, would be eligible for the derivative employment benefits of a city- or state-employed partner, including death benefits, would be eligible to adopt his partner’s biological child, and would be entitled to be free from discrimination on the basis of sexual orientation under the Civil Rights and Executive Laws. He would not, however, be able to recover as a spouse under the wrongful death statute based upon the holding of Raum v Restaurant Assoc. (252 AD2d 369 [1998], appeal dismissed 92 NY2d 946 [1998]).
At the time Raum was decided however, there was no state sanctioned union equivalent to marriage. Passage of the Vermont civil union statute provides a basis to distinguish Raum, and an earlier case, Matter of Cooper (187 AD2d 128 [1993], appeal dismissed 82 NY2d 801 [1993]), which withheld recognition of a right of election under the EPTL for same-sex couples. The laws regarding recognition of sister state marriages, such as a common-law marriage, provide a legal ground to revisit the meaning of the term spouse as used in the EPTL, and to distinguish the holdings in Raum and Cooper.
With respect to marriages entered into in sister states, New York adheres to the general rule that “marriage contracts, valid where made, are valid everywhere, unless * * * contrary to * * * natural laws, or * * * statute[s]” (Shea v Shea, 268 App Div 677, 684 [internal quotation marks omitted], revd 294 NY 909 [1945]). In Shea, a divided Appellate Division reversed the trial court and found that a common-law marriage, although valid in the state where it took place, should not be recognized in New York relying on Domestic Relations Law § 11, which was amended in 1933 to require solemnization for validity (268 App Div 677, 680 [1945]). The Appellate Division found the plaintiffs common-law marriage was prohibited by statute, as the 1933 amendment to section 11 of the Domestic Relations Law had as its main purpose abolition of common-law marriage in New York (see People v Heine, 12 AD2d 36, 38 [1960], affd 9 NY2d 925 [1961]). Dissenting, Justice Johnston relied upon the general rule stated above, that a marriage valid where made is valid in the State of New York, and noted that a refusal of recognition is usually reserved for incestuous *444 or polygamous marriages (268 App Div 677, 684 [1945]). Agreeing, the Court of Appeals reversed on the basis of his dissenting opinion (Shea v Shea, 294 NY 909 [1945], supra). Thus, notwithstanding that in general the validity of a common-law marriage “is always open to suspicion” especially “when one of the parties is dead” (Boyd v Boyd, 252 NY 422, 428 [1930]), it will be recognized in New York if found valid in the state where contracted (Shea v Shea, supra; Cross v Cross, 102 AD2d 638, 639-640 [1984]). This is true for purposes of descent in the Surrogate’s Court (Matter of Watts, 31 NY2d 491, 495 [1973]), and for purposes of the wrongful death statute (Black v Moody, 276 AD2d 303 [2000]). Thus, notwithstanding the premise in Raum v Restaurant Assoc. (252 AD2d 369 [1998], appeal dismissed 92 NY2d 946 [1998], supra) that unmarried heterosexual and homosexual couples are treated equally under the wrongful death statutes in New York, a common-law marriage may be established for an unmarried heterosexual couple under the jurisdiction of a sister state and the survivor becomes a “spouse” under the EPTL (Black v Moody, supra). It follows that, if plaintiff has a validly contracted marriage in the State of Vermont, and if the Vermont civil union does not offend public policy as would an incestuous or polygamous union, it will be recognized in the State of New York for purposes of the wrongful death statute (Shea v Shea, 294 NY 909 [1945], supra; Black v Moody, supra; cf. Matter of May, 305 NY 486 [1953] [upheld validity of a 32-year-old marriage between uncle and niece valid pursuant to their faith and lawfully contracted in the State of Rhode Island, notwithstanding the prohibition of Domestic Relations Law § 5 (3)]; see also Ferraro v Ferraro, 192 Misc 484 [1948], affd sub nom. Fernandes v Fernandes, 275 App Div 777 [1949] [recognizing proxy marriage]).
Initially, the court acknowledges the precept which calls for a court not to decide issues unnecessary to the resolution of a case {see, Cass R. Sunstein, The Supreme Court 1995 Term, Forward: Leaving Things Undecided, 110 Harv L Rev 4 [1996]; Gil Kujovich, An Essay on the Passive Virtue of Baker v. State, 25 Vt L Rev 93, 97 [“decisional minimalism”]). Thus the court will not determine whether plaintiff has a valid marriage in the State of New York for all purposes, but only whether he may be considered a spouse for purposes of the wrongful death statute, much as the Court of Appeals has held that a same-sex domestic partner is a “family” member for the limited purposes of New York City’s rent control laws (see, Braschi v Stahl Assoc. Co., 74 NY2d 201 [1989]). Although the court must *445 examine the nature of the Vermont civil union, and whether it can be distinguished from the honored state of marriage, the purpose of doing so is thus limited. To resolve the statutory spouse issue, discussion must primarily focus upon what a Vermont civil union is, and is not, and compare it to a marriage, and determine whether New York’s public policy precludes recognition under full faith and credit, as “there are some limitations upon the extent to which a state may be required by the full faith and credit clause to enforce even the judgment of another state in contravention of its own statutes or policy” (Lancaster v 46 NYL Partners, 228 AD2d 133, 140 [1996], quoting Pacific Ins. Co. v Industrial Acc. Commn., 306 US 493, 502 [1939]).
Addressing the issue of policy first, New York has not enacted a mini-DOMA. This acronym refers to the Federal Defense of Marriage Act (1 USC § 7; 28 USC § 1738C), which in response to Vermont’s civil union statute declares that a marriage is a union between a man and a woman, and that no state shall be “required to give effect” to a same-sex union. It is unclear by what authority the Congress may suspend or limit the Full Faith and Credit Clause of the US Constitution, and the constitutionality of DOMA has been put in doubt (see, e.g., Mark Strasser, Baker and Some Recipes for Disaster: On DOMA, Covenant Marriages, and Full Faith and Credit Jurisprudence, 64 Brook L Rev 307). Nevertheless, 35 states have passed mini-DOMAs (see, e.g., Burns v Burns, 253 Ga App 600, 601, 560 SE2d 47, 49 [2002] [statute declares that no “marriage between persons of the same sex” shall be recognized as entitled to the benefits of marriage]; Katie Eyer, Related Within the Second Degree? Burns v. Burns and the Potential Benefits of Civil Union Status, 20 Yale L & Pol’y Rev 297, 298). New York is not among them.
Both the State of New York and the City of New York recognize same-sex domestic partnerships for employment benefits (see Slattery v City of New York, 266 AD2d 24 [1999], appeal dismissed 94 NY2d 897 [2000]; Administrative Code of City of NY § 3-244). New York’s public policy is also revealed in the decision Braschi v Stahl Assoc. Co. (74 NY2d 201 [1989], supra), which was “the first appellate decision in the United States to accord legal recognition to a same-sex couple” (Arthur S. Leonard, Symposium on Same-Sex Marriage, Civil Unions, and Domestic Partnerships, Ten Propositions about Legal Recognition of Same-Sex Partners, 30 Cap U L Rev 343, 354). The Braschi court stated that a “realistic and valid” view of family *446 “includes two adult lifetime partners whose relationship is long term and characterized by an emotional and financial commitment and interdependence” (Braschi v Stahl Assoc. Co., 74 NY2d 201, 211 [1989]). As a guide to assessing whether one is a “family” member eligible for succession to a rent-controlled apartment, and revealing the evolving attitudes toward same-sex couples, the Court stated:
“In making this assessment, the lower courts of this State have looked to a number of factors, including the exclusivity and longevity of the relationship, the level of emotional and financial commitment, the manner in which the parties have conducted their everyday lives and held themselves out to society, and the reliance placed upon one another for daily family services * * * These factors are most helpful, although it should be emphasized that the presence or absence of one or more of them is not dispositive since it is the totality of the relationship as evidenced by the dedication, caring and self-sacrifice of the parties which should, in the final analysis, control.” (Braschi v Stahl Assoc. Co., supra at 212-213.)
New York has also interpreted adoption laws to allow what has been termed “second parent adoption,” i.e., to allow the biological parent’s live-in homosexual life partner to adopt the child, rejecting a literal reading of the statute that would have forced the biological parent to relinquish parental rights (see Matter of Jacob, 86 NY2d 651, 668 [1995]).
Finally, and without being exhaustive as to the rights of gays and lesbians under New York law, same-sex partners are entitled to recompense as those aggrieved by the tragic loss of life on September 11. New York City has amended its Domestic Partner Registry “to extend New York City’s commitment to recognizing rights of same sex partners by revising the definition of ‘domestic partners’ in the administrative code to include persons who have * * * entered civil unions or marriages not explicitly recognized by New York State in other jurisdictions” (Local Law No. 24 [2002] of City of New York), and, while other jurisdictions were enacting mini-DOMAs, New York State amended Civil Rights Law § 40-c regarding equal protection to prohibit discrimination on the basis of sexual orientation (L 2002, ch 2, § 15), and Executive Law § 291 to prohibit discrimination in employment, education and housing accommodations (L 2002, ch 2, § 2).
*447 Concluding that New York’s public policy does not preclude recognition of a same-sex union entered into in a sister state, the next issue is Vermont’s civil union statute. Passage of Vermont’s historic civil union statute was compelled by a decision of the Vermont Supreme Court which, acknowledging that the question before it “arouses deeply-felt religious, moral, and political beliefs,” and framing the question to focus “on the statutory and constitutional basis for the exclusion of same-sex couples from the secular benefits and protections offered married couples,” held that all Vermont citizens, both heterosexual and homosexual, are entitled to the benefits and protections of a state sanctioned union under the Common Benefits Clause of the Vermont Constitution (Baker v Vermont, 170 Vt 194, 197, 744 A2d 864, 867 [1999]). In its conclusion, the court placed its decision in an historical context, summing up as follows:
“The past provides many instances where the law refused to see a human being when it should have. See, e.g., Dred Scott, 60 U.S. at 407 (concluding that African slaves and their descendants had ‘no rights which the white man was bound to respect’). The future may provide instances where the law will be asked to see a human when it should not. See, e.g., G. Smith, Judicial Decisionmaking in the Age of Biotechnology, 13 Notre Dame J. Ethics & Pub. Policy 93, 114 (1999) (noting concerns that genetically engineering humans may threaten very nature of human individuality and identity). The challenge for future generations will be to define what is most essentially human. The extension of the Common Benefits Clause to acknowledge plaintiffs as Vermonters who seek nothing more, nor less, than legal protection and security for their avowed commitment to an intimate and lasting human relationship is simply, when all is said and done, a recognition of our common humanity.” (Baker v Vermont, 170 Vt 194, 229, 744 A2d 864, 889 [1999], supra.)
The Vermont statute, effective July 1, 2000, requires that plaintiff be entitled to “the benefits and protections” and “be subject to the rights and responsibilities” of “spouses” (Vt Stat Ann, tit 15, § 1201 [2]), and “gives same-sex couples access to more than 300 rights derived from Vermont state law” (Angie Smolka, Note, That’s the Ticket: A New Way of Defining Family, 10 Cornell JL & Pub Pol’y 629, 641). To be eligible to enter into a recognized state sanctioned civil union, a person may *448 not be “a party to another civil union or marriage” (Vt Stat Ann, tit 15, § 1202 [1]), must secure a license (Vt Stat Ann, tit 18, § 5160) and must be joined by a judge, justice of the peace or a member of the clergy (Vt Stat Ann, tit 18, § 5164). Civil union affords “all the same benefits, protections and responsibilities under law, whether they derive from statute, administrative or court rule, policy, common law or any other source of civil law, as are granted to spouses in a marriage” (Vt Stat Ann, tit 15, § 1204 [a]). A party to a civil union is included in the definition of the term spouse, family, immediate family, dependent, next of kin and “other terms that denote the spousal relationship, as those terms are used throughout the law.” (Vt Stat Ann, tit 15, § 1204 [b].) Parties to a civil union are responsible for support “to the same degree and in the same manner as prescribed under the law for married persons” (Vt Stat Ann, tit 15, § 1204 [c]). Annulment, separation, divorce, child custody and support, property division and maintenance apply to parties to a civil union (Vt Stat Ann, tit 15, § 1204 [d]). The statute lists spousal legal benefits, protections and responsibilities including laws relating to title, tenure, descent and distribution, intestate succession, waiver of will, survivor-ship, or other incidents of the acquisition, ownership, or transfer, inter vivos or at death, of real or personal property, including ability to hold real and personal property as tenants by the entirety (Vt Stat Ann, tit 15, § 1204 [e] [1]). It includes an action for wrongful death, and addresses adoption law and proceedings, prohibitions based upon marital status, family leave benefits, public assistance benefits, and the marital communication privilege precluding compelled testimony regarding spousal communications (Vt Stat Ann, tit 15, § 1204 [e]). A civil union under Vermont law is distinguishable from marriage only in title, as it defines marriage as “the legally recognized union of one man and one woman” (Vt Stat Ann, tit 15, § 1201 [4]). Yet it goes so far as to include a presumption of legitimacy for either party’s natural child born during the union (Vt Stat Ann, tit 15, § 1204 [f]), giving new meaning to the well-established legal fiction intended to protect innocent children “ensuring their financial and emotional security, and ultimately preserving the stability of the family unit” (see, Godin v Godin, 168 Vt 514, 521-522, 725 A2d 904, 909 [1998]). The presumption of legitimacy, when extended to a same-sex couple, together with the obligations of support and requirement for a divorce, indicate that the civil union is indistinguishable from marriage, notwithstanding that the Vermont *449 Legislature withheld the title of marriage from application to the union.
While the Vermont Legislature’s enactment of the civil union has been described by one commentator as a “heroic and historic attempt to recognize the reality and worth of lesbian and gay families” (Greg Johnson, Vermont Civil Unions: The New Language of Marriage, 25 Vt L Rev 15, 18), it has also been disparagingly called “separate but equal” in recognition of the possibility that it may be treated as an inferior status to that of marriage (see, David B. Cruz, Just Don’t Call It Marriage: The First Amendment and Marriage as an Expressive Resource, 74 S Cal L Rev 925, 1020). Nevertheless, in Vermont, John Langan is the spouse of Neal Spicehandler and is entitled to recover for his wrongful death. The issue remains, whether under full faith and credit or principles of comity, he will be recognized as a spouse in New York, as would a spouse in a sister state common-law marriage.
Under principles of full faith and credit and comity, and following authority which advances the concept that citizens ought to be able to move from one state to another without concern for the validity or recognition of their marital status, New York will recognize a marriage sanctioned and contracted in a sister state and there appears to be no valid legal basis to distinguish one between a same-sex couple. And, unlike a non-ceremonial common-law marriage contracted in a sister state which may be dissolved at will, yet is recognized in New York, the Vermont civil union requires a sanctioned civil ceremony, a license, and, significantly, a divorce to end the union.
The Domestic Relations Law defines marriage as a “civil contract” so far as its “validity in law” is concerned (Domestic Relations Law § 10). Nevertheless it is not subject to dissolution at the will of the parties, for the “traditional principle is that marriage is a relationship formed by contract, but once formed, is a status protected by, and subject to law” (Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 10, at 97). Marriage “ ‘ has always been subject to the control of the Legislature * * * [which] prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution’ ” (Helfond v Helfond, 53 Misc 2d 974, 976 [Sup Ct, Nassau County 1967], quoting Maynard v Hill, 125 US 190, 205 [1888]). In short, marriage is *450 a civil contract regulated by the state in its conduct and its dissolution (Di Lorenzo v Di Lorenzo, 174 NY 467, 472 [1903] [due regard for its consequences and for the orderly constitution of society has caused marriage to be regulated by laws in its conduct as in its dissolution]). Thus the Vermont civil union, which is subject to legislative control, conforms in all respects to the requirements for a marriage. Although it explicitly reserves the title “marriage” for a union between a man and a woman, it does not so reserve the title “spouse,” as a civil union partner, like a husband or a wife, is a spouse for all purposes under Vermont law, and the meaning of the term spouse is the only issue here.
Thus, the ultimate issue may be framed as the question whether EPTL 4-1.1 excludes spouses who are in every material way sanctioned in a union for life because they may not be properly described as a husband or a wife, or more pointedly, because they are both men or both women. Taking heed of Justice Brandéis’ admonition, that “we must be ever on our guard, lest we erect our prejudices into legal principles” (New State Ice Co. v Liebmann, 285 US 262, 311 [1932] [Brandeis, J., dissenting]), this court must look to the “legislative purpose as well as legislative language” of the EPTL’s protection of a spouse to determine whether plaintiff is a person entitled to such protection (see Matter of Jacob, 86 NY2d 651, 657 [1995]).
As noted, this court adheres to the analytical framework of Matter of Jacob regarding statutory construction in the “sensitive” area of family matters, specifically that “[w]hat is to be construed strictly and applied rigorously * * * is legislative purpose as well as legislative language” (Matter of Jacob, supra). It is noted that the dissent in Matter of Jacob would not be operative or relevant here, as it focused and was premised upon unsanctioned at-will relationships without color of law (Matter of Jacob, 86 NY2d 651, 669 [1995], supra).
Turning to legislative purpose, the wrongful death statute is intended to “promote the public welfare” (Raum v Restaurant Assoc., 252 AD2d 369, 371 [1998] [Rosenberger, J., dissenting], supra), and. its goals “are to compensate the victim’s dependents, to punish and deter tortfeasors and to reduce welfare dependency by providing for the families of those who have lost their means of support” (Raum v Restaurant Assoc., supra at 374 [Rosenberger, J., dissenting]). Thus the wrongful death statute is intended to compensate the pecuniary losses first and foremost of the decedent’s immediate family, that is, his or her spouse and children, those most likely to have expected *451 support and to have suffered pecuniary injury (see generally, Loucks v Standard Oil Co. of N.Y., 224 NY 99, 104 [1918] [Cardozo, J.]). The person most likely to have expected support and to have suffered pecuniary injury here is plaintiff, Spicehandler’s immediate family and spouse under the Vermont statute, and the only legatee under his will.
Turning to the statutory language, the EPTL provides that only certain classes of people may recover for wrongful death. They are “distributees” (EPTL 5-4.1), defined as those who are “entitled to take or share in the property of a decedent under the statutes governing descent and distribution” (EPTL 1-2.5), and they are compensated not for injuries sustained by the decedent, but for their pecuniary injuries suffered as a result of his or her death (EPTL 5-4.3). Distributees are identified both for purposes of intestacy and wrongful death, and include a “spouse,” “issue,” “parents,” and “grandparents or [their] issue” (EPTL 4-1.1 [a]).
There is no definition section for those identified as legatees. However, a definition is included under a section which addresses and delineates when a surviving spouse is disqualified from recovery. It states:
“§ 5-1.2 Disqualification as surviving spouse “A husband or wife is a surviving spouse within the meaning, and for the purposes of 4-1.1, 5-1.1, 5-1.1-A, 5-1.3, 5-3.1 and 5-4.4, unless it is established satisfactorily to the court having jurisdiction of the action or proceeding that:
“(1) A final decree or judgment of divorce, of annulment * * * was in effect when the deceased spouse died.
“(2) The marriage was void as incestuous * * * bigamous * * * or a prohibited remarriage * * *
“(3) The spouse had procured outside of this state a final decree or judgment of divorce from the deceased spouse * * *
“(4) A final decree or judgment of separation * * * was in effect when the deceased spouse died.
“(5) The spouse abandoned the deceased spouse, and such abandonment continued until the time of death.
“(6) A spouse who, having the duty to support the other spouse, failed or refused to provide for such spouse * * *” (EPTL 5-1.2).
*452 From the language set forth, the statute addresses whether a “surviving spouse is disqualified from sharing in intestacy * * * electing against the will * * * taking ‘set off property * * * and sharing in a wrongful death recovery” based upon whether the marriage is intact and functioning, and appears less concerned with whether a spouse is a man or woman, i.e., a husband or wife (see Margaret Valentine Tur ano, Practice Commentaries, McKinney’s Cons Laws of NY, Book 17B, EPTL 5-1.2, at 206). The terms husband and wife appear descriptive rather than exclusionary, based upon the section’s focus upon disqualification.
The court acknowledges that at the time the wrongful death statutes were written, the use of the term spouse did not envision inclusion of a same-sex marital partner. But as the concepts of marriage evolve over time, leaving behind the common-law doctrine that “a woman was the property of her husband” and her “legal existence” was “ ‘incorporated and consolidated into that of the husband’ ” (see People v Liberta, 64 NY2d 152, 164 [1984]), so too public opinion regarding same-sex unions is evolving. At the time the statute was written, there were no sanctioned same-sex couples, much less domestic partnerships, civil unions, reciprocal beneficiaries, and, as in the Netherlands, full-fledged same-sex marriage (see Nancy G. Maxwell, Opening Civil Marriage to Same-Gender Couples: A Netherlands-United States Comparison, 18 Ariz J Inti & Comp L 141, 200). Indeed, homosexuality had not yet been removed from the professional medical and psychological definitions of disease (Martha M. Ertman, Oscar Wilde: Paradoxical Poster Child for Both Identity and Post-Identity, 25 L & Soc Inquiry 153, 166), and consenting adult homosexual intimacy was considered criminal (see, People v Onofre, 51 NY2d 476 [1980]). Nor had Ford, General Motors, Chrysler and Coca-Cola provided benefits to the same-sex partners of its employees (David M. Skover, Lesbigay Identity as Commodity, 90 Cal L Rev 223, 237-238 [the total number of private employers now offering domestic partnership benefits approximates 3,500]).
The words of the statute, referring to a spouse as a husband or wife, operate to clarify that the intended primary beneficiaries are the members of the legally sanctioned family unit which is still intact.
There is a compelling reason to construe the EPTL to include a Vermont spouse under the fundamental tenet of construction that “a statute ought normally to be saved by construing it in accord with constitutional requirements” (People v Dietze, 75 *453 NY2d 47, 52 [1989]). That “the very language of the statute must be fairly susceptible of such an interpretation” is not an obstacle here, and the court “ ‘may reasonably find implicit’ in the words used by the Legislature” that all spouses were to be included (see, People v Dietze, 75 NY2d 47, 52 [1989]). Spouse is a gender neutral word, it applies to a man or a woman, and is applied to plaintiff under the Vermont civil union. As the EPTL is construed to apply to a common-law couple who have not been joined by a civil ceremony and may separate at will, it is impossible to justify, under equal protection principles, withholding the same recognition from a union which meets all the requirements of a marriage in New York but for the sexual orientation of its partners. The state “may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective” (Under 21 v City of New York, 108 AD2d 250, 254 [1985], mod on other grounds 65 NY2d 344 [1985]; Lofton v Kearney, 157 F Supp 2d 1372, 1381 [SD Fla 2001]). For example, with respect to wrongful death statutes, the Supreme Court has held that a distinction between illegitimate and legitimate children for purposes of recovery is an irrational one (Glona v American Guar. & Liab. Ins. Co., 391 US 73 [1968]).
Although discrimination on the basis of sexual orientation constitutes a violation of equal protection under the United States and New York Constitutions (Under 21 v City of New York, 126 Misc 2d 629 [1984]), a heightened level of scrutiny to classifications based on “sexual orientation” has not been applied (Under 21 v City of New York, 65 NY2d 344, 364 [1985]; see also Romer v Evans, 517 US 620 [1996]). Thus the constitutional question to be answered is whether a refusal to recognize plaintiff as a surviving spouse under the EPTL is supported by a “rational basis” (Golden v Clark, 76 NY2d 618, 624 [1990]).
This court is mindful that it must pay due respect to the legal wisdom of the rule that a court should be “certain of its ground before making a categorical finding that there is no permissible objective served by a state statute or that there is utterly no sensible of [sic] discernible relation between the legislature’s classification and a legitimate end” (In re Paris Air Crash, 622 F2d 1315, 1319 [1980] [9th Cir Cal], cert denied 449 US 976 [1980]). But where a statute draws a distinction based upon marital status the distinction “must be based upon ‘some ground of difference that rationally explains the different treatment’ ” (People v Liberia, 64 NY2d 152, 163 [1984]). Here *454 there is no difference for state purposes between a married person and a person joined in civil union under the laws of Vermont except sexual orientation. Upon examination of the rejection of homosexual unions in the past, the reasons propounded for supporting distinctions, such as the at-will nature of homosexual relationships and the absence of children, society’s future, from their unions, simply do not apply, in light of the Vermont civil union and New York’s and Vermont’s rules regarding adoption. The civil union is indistinguishable for societal purposes from the nuclear family and marriage.
Defendant relies heavily upon the decision in Raum v Restaurant Assoc. (252 AD2d 369 [1998], appeal dismissed 92 NY2d 946 [1998]) and Matter of Storrs v Holcomb (168 Misc 2d 898 [1996], affd 245 AD2d 943 [1997]). The dissent in Raum is instructive with respect to emerging public attitudes toward the rights of same-sex couples, and the rationale forged by the majority, although it did not favor the homosexual plaintiff there, lends support here. Raum held that the wrongful death statute excludes unmarried heterosexual partners to the same extent that it excludes unmarried homosexual partners, and therefore it does not discriminate on the basis of sexual orientation. Plaintiff cannot be categorized as an “unmarried” partner, rather he is like a common-law partner, recognized in New York as a spouse because lawfully recognized in a sister state. To withhold recognition from one joined under the Vermont statute on the grounds that it is not a marriage, when it requires all the same formalities as New York, and at the same time to extend recognition to a common-law “marriage” of a sister state, does not withhold benefits equally from homosexuals and heterosexuals. The second rationale identified in Raum is not applicable here, as orderly succession of property rights among clearly defined classes of persons is not weakened. There cannot be two spouses making claims under Vermont law, as there could be with couples who may separate and combine at will. It must be emphasized that this court does not address a “functional” definition of spouse, an approach disapproved in Raum. Plaintiff is a literal spouse under the Vermont statute, not a functional or virtual one. As the Vermont statute is written, the criminal prohibition against bigamy would apply to him.
With respect to Matter of Storrs v Holcomb, also relied upon by defendant, the case does not stand as authority for any proposition, as the Appellate Division affirmed the dismissal, *455 but on the procedural grounds that a necessary party had not been joined. Thus, the petitioners’ contentions on the merits on appeal were not addressed, and were not properly reached at Special Term (see, Matter of Storrs v Holcomb, 245 AD2d 943, 946 [1997]).
Accordingly, this court finds, as have other courts addressing the issue of wrongful death benefits for a same-sex partner in the Superior Court of California (Smith v Knoller, Super Ct, San Francisco, Aug. 9, 2001, Index No. 319532) and the Superior Court of Washington, D.C. (Solomon v District of Columbia, DC Super Ct, Apr. 26, 1995, No. 94-2709, 21 Fam L Rep 1305, 1316), that plaintiff, a surviving spouse under the laws of Vermont, is included within the meaning of spouse as it is used under section 4-1.1 of the EPTL, and has standing to recover for the wrongful death of Neal Conrad Spicehandler. The court finds no issue of estoppel preventing an award of summary judgment with respect to this issue, as plaintiff gave notice that he sought summary judgment, defendant did not respond on the merits, and the court finds no material fact asserted in the Surrogate’s Court which is contradicted in this proceeding. Plaintiff’s status as a spouse was irrelevant to the surrogate’s proceeding where he was the sole legatee under the will (see, Environmental Concern v Larchwood Constr. Corp., 101 AD2d 591, 593 [1984]).