OPINION OF THE COURT
Doris Ling-Cohan, J.
From the literary references of Shakespeare’s Romeo and Juliet, to the anti-miscegenation laws of this country’s recent past barring interracial marriage, the freedom to choose whom to marry has consistently been the subject of public outcry and controversy. In fact, ironically, the parents of one of the named plaintiffs[1] were, themselves, barred from marrying each other by an anti-miscegenation law that made it illegal for interracial couples to marry. In 1966, in order to marry, plaintiff Curtis Woolbright’s parents moved to California,[2] the only state at that time whose courts had declared bans on interracial marriage unconstitutional.
Thirty-eight years later, their son (Curtis Woolbright), his partner, and four other couples, bring suit to secure the fundamental right to choose one’s partner in marriage. Karen Woolbright, mother of plaintiff Curtis Woolbright, understands from her own experience a generation ago what this means for her son:
“My son . . . and his beloved partner, Daniel Reyes, should have the right to get married for the same *461 reasons I should have had the right to marry my husband, Curtis Woolbright Sr., in the early 1960’s. My husband’s home state Texas, and many other states at the time, restricted us from getting married, because he was black and I am white. There was no reason to exclude us from marriage other than fear and prejudice ... I cannot express how important it was to get married. As a married couple, we received protections and respect for our family that were still withheld in many parts of the country to inter-racial couples . . . [G]etting married also affected my self-esteem. Looking back I can say that the first day I referred to Curt as my husband validated my relationship and my feelings for him.” (Affidavit of Karen Woolbright ¶¶ 3, 9, attached to affirmation of Susan L. Sommer in support of plaintiffs’ motion for summary judgment dated July 29, 2004 [plaintiffs’ motion].)
An instructive lesson can be learned from the history of the anti-miscegenation laws and the court decisions which struck them down as unconstitutional. The challenges to laws banning whites and nonwhites from marriage demonstrate that the fundamental right to marry the person of one’s choice may not be denied based on long-standing and deeply held traditional beliefs about appropriate marital partners.
Although anti-miscegenation laws were first enacted in colonial days, such laws were still common into the 1960’s and upheld in case after case based on tradition rooted in perceived “natural” law.[3] For example, the Indiana Supreme Court relied on the “undeniable fact” that the “distribution of men by race and color is as visible in the providential arrangement of the earth as that of heat and cold.” (State v Gibson, 36 Ind 389, 405 [1871].) According to the Indiana Supreme Court, the laws requiring separation of the races derive not from “ ‘prejudice, nor caste, nor injustice of any kind, but simply to suffer men to follow the law of races established by the Creator himself, and not to compel them to intermix contrary to their instincts.’ ” (Id., quoting West Chester & Philadelphia R.R. Co. v Miles, 55 Pa 209, 214 [1867]; see also Scott v State, 39 Ga 321, 326 [1869] [“moral or social equality between the different races . . . does not in fact exist, and never can”].)
*462 It was not until 1948 that the first state Supreme Court rejected the reigning doctrine that laws limiting marriage to partners of the same race reflected natural law impervious to constitutional challenge. (Perez v Sharp, 32 Cal 2d 711, 198 P2d 17 [1948].) The California anti-miscegenation law prohibited marriages of “white persons” to “negroes, Mongolians, members of the Malay race, or mulattoes.” (32 Cal 2d at 712, 198 P2d at 17.)
Almost two decades after the groundbreaking and controversial California Supreme Court decision in Perez, the United States Supreme Court in Loving v Virginia (388 US 1 [1967]) declared that Virginia’s anti-miscegenation statute violated the fundamental right to marry and the guarantee of equal protection. At the time, about one third of all states still had laws prohibiting interracial marriage.[4] In fact, the trial court in Loving, even as late as the 1960’s, had rejected the rights of adults to choose their marital partners based on out-moded prejudices that are now recognized as illegitimate grounds for governmental action:
“Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with his arrangement there would be no cause for such marriages. The fact that he separated the races shows that he did not intend for the races to mix.” (Loving, 388 US at 3, quoting op of trial judge.)
As with the Perez court, the United States Supreme Court was not deterred by the deep historical roots of anti-miscegenation laws (Loving, 388 US at 7, 10); their continued prevalence (id. at 6 n 5); nor any continued popular opposition to interracial marriage. (Id. at 7.) Instead, the Court held that “[u]nder our Constitution, the freedom to marry or not marry, a person of another race resides with the individual and cannot be infringed by the State,” declaring that “[m]arriage is one of the ‘basic civil rights of man,’ fundamental to our very existence and survival.” (Id. at 12, quoting Skinner v State of Okla. ex rel. Williamson, 316 US 535, 541 [1942].)
I. Background
Here, plaintiffs, members of five same-sex couples living in New York City, move for summary judgment declaring that, under the New York State Constitution, they are entitled to *463 treatment equal to that of opposite-sex couples with regard to the issuance of marriage licenses and access to civil marriage. They contend that, insofar as New York State’s Domestic Relations Law denies marriage licenses and access to civil marriage to same-sex couples, it violates the Due Process and Equal Protection Clauses of the New York State Constitution. In addition to declaratory relief, plaintiffs seek an injunction requiring defendant to grant each of the couples a marriage license.
Defendant Victor Robles (defendant clerk), who is sued in his official capacity as City Clerk of the City of New York, cross-moves for summary judgment dismissing the complaint. Defendant is the administrator of the New York City Marriage License Bureau and has responsibility for the issuance of marriage licenses and the solemnization of civil marriages in New York City.
The partners in each couple have been devoted to one another for periods ranging from 3 to 22 years and represent the rich diversity of New York. Several of the couples are raising children conceived during the relationship or adopted into their homes. The individual plaintiffs come from an array of racial, ethnic, and religious backgrounds and include health care professionals, a computer specialist, a textile stylist, a waiter, city planners, and a director of an emergency food assistance program. Each couple wishes to enter into a civil marriage, but was denied a marriage license by defendant clerk. Plaintiffs allege that they have suffered serious hardship because of their exclusion from civil marriage. Plaintiffs claim that without this State’s recognition of same-sex marriage, they are denied the protections, benefits, and mutual responsibilities automatically afforded to married couples by New York state law.
Illustrative of the hardships caused by the exclusion of same-sex marriage is the relationship of Mary Jo Kennedy and Jo-Ann Shain.[5] Mary Jo Kennedy is a medical director of a family health center and Jo-Ann Shain is an editor of medical publications for lawyers. Having met at a public health conference, they moved in together and have been committed to each other in their loving relationship for 22 years.
After discussing and understanding the momentous responsibility of bringing a child into the world, they decided to have a family. Jo-Ann’s parents were happy that the couple was start *464 ing a family, as they have always treated Mary Jo as their daughter. Jo-Ann conceived a child through anonymous sperm donation and Mary Jo was with her at every step. In order to become the child’s second legal parent, however, Mary Jo was required to go through an extensive legal process and waited years before she could adopt the child. In 1996, immediately after second-parent adoptions became legal in New York, Mary Jo was able to formally adopt the child. Mary Jo and Jo-Ann had to endure considerable expense, including hiring lawyers, and had their privacy invaded in the process. If they had been a married couple, Mary Jo would automatically have been the child’s legal parent. While they had registered as domestic partners in New York City in 1993, such registration did not serve as an adequate substitute for marriage, since it provided the family with fewer privileges and protections.
Mary Jo Kennedy and Jo-Ann Shain’s child is now 15 years old. The family travels together, takes vacations with extended family and friends, and volunteers at a local homeless shelter and a soup kitchen. Nonetheless, as detailed in her affidavit, the child feels that it is unfair that her parents cannot be married to each other and that it is wrong that she can have a legal relationship with each of her parents, but they cannot have the legal relationship of marriage to each other.
Four other couples detail, in their affidavits, similar committed and loving relationships. In all respects, but the ability to marry, the relationships are typical of countless couples within the city and throughout the state; jobs are held, children are raised, day-to-day family concerns are addressed.
Plaintiffs Michael Elsasser, 49, and Douglas Robinson, 52, have lived together for 18 years. They live with their two sons, ages 18 and 15. Douglas adopted both boys from the New York City foster care program when they were infants. He is an assistant vice-president and technical project manager at Citibank. His partner is a woven textile stylist and technician at a Manhattan-based company and vice-president of the co-op board in the building where the couple lives. Plaintiffs Daniel Reyes, 30, and Curtis Woolbright, 37, have lived together for three years, contributing equally to all of their expenses, including rent for their apartment, utilities, groceries, credit card payments, car insurance and care for their two dogs. Daniel is the director of an Acute Emergency Food Assistance Program for Yorkville Common Pantry in Harlem. Curtis is an aspiring voice-over artist, and pays the bills by working as a waiter.
*465 Plaintiffs Lauren Abrams, 39, and Donna Freeman-Tweed, 43, have lived together for six years. They live with their four-year-old son and their newborn son. Lauren is the biological mother of both boys, who were conceived through anonymous donor insemination. Donna’s second-parent adoption of the older son was finalized in 2002, and the couple has begun the process of petitioning the State for second-parent adoption of their second child. Lauren is a midwife at Mt. Sinai Hospital in Manhattan. Her partner is a physician’s assistant at the Brooklyn College Health Clinic.
Plaintiffs Daniel Hernandez, 46, and Nevin Cohen, 41, have lived together for five years. Daniel manages urban redevelopment projects at Jonathan Rose Companies. Nevin, an environmental planner, played an instrumental role in writing New York City’s recycling law, when he worked as a policy analyst for the New York City Council. Recently, he founded his own environmental planning firm.
Each of the plaintiff couples appeared at defendant clerk’s offices in March 2004, and sought a marriage license. All were informed that the Domestic Relations Law does not authorize the issuance of marriage licenses to same-sex couples. They were given a form letter[6] explaining that defendant had recently received an advisory opinion from the Law Department of the City of New York[7] advising his office to continue to decline requests for marriage licenses from same-sex couples, and that the Attorney General of the State of New York had issued an informal opinion[8] concluding that New York law does not currently authorize same-sex marriages. A copy of each of those opinions was attached to the form letter. Also attached was an informational handout explaining New York City’s Domestic Partnership registration program. The letter noted that Domestic Partnership registration offers some, although not all, of the legal protections of marriage within New York City.
*466 Defendant does not dispute that plaintiffs are serious, committed couples, devoted to building lives together as families, whose relationships are no different from those of married couples. In fact, defendant acknowledges that same-sex couples can establish committed, loving relationships and can be fine parents. (Defendant’s amended mem of law in support of cross motion for summary judgment, dated Sept. 4, 2004, at 2 [defendant’s brief].)[9]
Since both sides agree that there are no material facts in dispute, summary judgment is appropriate. (See CPLR 3212 [b]; Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395 [1957].)
II. Discussion
A. Disadvantages Suffered by Plaintiff Couples and Their Children
Defendant does not dispute that plaintiffs and their children suffer serious burdens by being excluded from civil marriage.[10] Marriage provides an extensive legal structure that protects the couple and any children. It is not disputed, for example, that among many other disadvantages, plaintiff couples may not own property by the entireties; file joint state income tax returns; obtain health insurance through a partner’s coverage; obtain joint liability or homeowner’s insurance; collect from a partner’s pension benefits; have one partner of the two-women couples be the legal parent of the other partner’s artificially inseminated child, without the expense of an adoption proceeding; invoke the spousal evidentiary privilege; recover damages for an injury to, or the wrongful death of, a partner; have the right to make important medical decisions for a partner in emergencies; inherit from a deceased partner’s intestate estate; or determine *467 a partner’s funeral and burial arrangements.[11] “Marriage laws provide many financial and legal protections to married couples. The United States General Accounting Office has identified 1,049 federal laws in which benefits, rights, and privileges are contingent on marital status.” (People v Greenleaf, 5 Misc 3d 337, 343 [Just Ct, Ulster County 2004].)
The concern that, without the legal recognition of marriage, a committed relationship may not be recognized if one of the couples is faced with a health crisis was experienced by a number of plaintiffs, including plaintiff Nevin Cohen (Cohen affidavit U 12, attached to Sommer affirmation, plaintiffs’ motion): “When [my partner] was ill and in the hospital, I was not always given the same information or asked the same decision-making questions in a way a spouse would be.” Mary Jo Kennedy recounted: “In 1992, an emergency sent Jo-Ann to the hospital. As she lay in the hospital awaiting surgery, we rushed to fill out revised forms to make sure that I could consent to treatment for her if necessary. Needless to say, that situation was very stressful and would not have occurred if we had been married.” (Kennedy 1Í18, plaintiffs’ motion.)
Although, in New York City, same-sex couples may register as “domestic partners” (Administrative Code of City of NY § 3-240), the benefits are relatively minimal compared to those of civil marriage. The benefits of domestic partnership are essentially limited to visitation rights with domestic partners in city facilities, health benefits, bereavement and child care leave for city employees, and eligibility to qualify as a family member for purposes of New York City-owned or operated housing. (See Administrative Code § 3-244 [a]-[f].)
One of the most important benefits of marriage is the securing of the bonds between parents and children and the protection of children raised in the family. For example, the children of parents in same-sex relationships are not necessarily covered by the statutory duty of support. (See Family Ct Act, art 4, § 413.) Under state law, when a couple elects to conceive a child through donor insemination, only the married couple can ensure that at birth the child has an automatic legal parent-child relationship with each, upon their written consent. (Domestic Relations Law § 73.)
Marriage also imposes reciprocal responsibilities on spouses, which serve to protect the family, including the legal require *468 xnent that spouses provide each other with financial support or face legal redress in certain circumstances, such as if one spouse is a recipient of public assistance. (Social Services Law § 101.) Spouses, but not unmarried couples, are permitted to take out insurance policies on each other. (Domestic Relations Law § 52; Insurance Law § 3205.)
In addition to legal rights and obligations embodied in New York statutes, many private entities, such as employers, rely on the State’s conferral of marriage and the resulting status of spouse in providing benefits.[12] These include health insurance benefits, health club benefits and car insurance.[13]
Furthermore, plaintiff couples and their children suffer numerous intangible burdens as the result of being relegated to a caste-determined status that is different from that of families in which the adult couple has been allowed to marry.[14]
B. New York State’s Domestic Relations Law
Plaintiffs seek to enter into a civil marriage, as defined by the Domestic Relations Law. The secular nature of civil marriage was recognized by the Supreme Court as early as 1888 in Maynard v Hill (125 US 190 [1888]), in which the Court held: “[M]arriage is often termed ... a civil contract . . . and does not require any religious ceremony for its solemnization . . . The relation once formed, the law steps in and holds the parties to various obligations and liabilities.” (Id. at 210-211.) “Th[e] statute [Domestic Relations Law] declares it a civil contract, as distinguished from a religious sacrament.” (Id. at 212, citing Wade v Kalbfleisch, 58 NY 282 [1874].) Marriage is viewed as the “pre-eminent . . . basis of civil institutions,” which gives “character to our whole civil polity.” (Id. at 213.)
The first issue before this court is whether defendant was correct in concluding that the Domestic Relations Law does not permit same-sex couples to marry. The Domestic Relations Law does not expressly bar same-sex marriage. Indeed, Domestic Relations Law § 10 defines jural marriage without any reference to *469 the sex of the parties to a marriage. Domestic Relations Law § 10 provides that “[mjarriage, so far as its validity in law is concerned, continues to be a civil contract, to which the consent of parties capable in law of making a contract is essential.”
However, certain other sections of the Domestic Relations Law express the Legislature’s assumption that the parties to a marriage will be a man and a woman. For example, Domestic Relations Law § 12 provides, in relevant part, that “[n]o particular form or ceremony is required when a marriage is solemnized as herein provided by a clergyman or magistrate, but the parties must solemnly declare in the presence of a clergyman or magistrate and the attending witness or witnesses that they take each other as husband and wife.” Similarly, Domestic Relations Law § 15 (1) (a) provides that:
“It shall be the duty of the town or city clerk when an application for a marriage license is made to him or her to require each of the contracting parties to sign and verify a statement . . . containing the following information. From the groom: Full name of husband . . . From the bride: Full name of bride.”
So too, Domestic Relations Law § 50 provides that “[pjroperty . . . now owned by a married woman . . . shall not be subject to her husband’s control.” Finally, for purposes of this discussion, Domestic Relations Law § 73 (1) provides that “[a]ny child born to a married woman by means of artificial insemination . . . with the consent in writing of the woman and her husband, shall be deemed the legitimate, natural child of the husband and his wife . . . .”
The Corporation Counsel’s advice to defendant City Clerk, that he continue his long-standing practice of issuing marriage licenses only to opposite-sex couples, was largely based on these sections of the Domestic Relations Law, and on other sections that use the words “husband” and “wife.” Additionally, it was the Corporation Counsel’s view that, if a New York court found defendant’s refusal to issue licenses to same-sex couples to be unconstitutional, the court might leave it to the Legislature to rectify the constitutional infirmity. (Corporation Counsel Op at 9, attached to Trachtman affirmation as exhibit 3.)
Similarly, the Attorney General of the State of New York, in an informal opinion advised that, although the Domestic Relations Law does not expressly bar marriage of same-sex couples, and while the canons of statutory interpretation instruct courts not to correct supposed omissions or defects in legislation, both *470 the inclusion of gender-specific terms in multiple sections of the Domestic Relations Law, and the historical context in which the Domestic Relations Law was enacted, indicate that the Legislature did not intend to authorize same-sex marriage. (Átty Gen Op at 7-11.)[15]
This court agrees. The opinions of the Corporation Counsel and the Attorney General are consistent with that of the Supreme Judicial Court of Massachusetts, which held that, although the Massachusetts marriage licensing statute did not expressly bar same-sex marriage, in interpreting the statute, the court must do so “to carry out the Legislature’s intent.” (Goodridge v Department of Pub. Health, 440 Mass 309, 319, 798 NE2d 941, 952 [2003].)
In addition, the consanguinity provisions of the Domestic Relations Law, like those in the Massachusetts statute, expressly bar marriage between certain male and female relatives; here, brother and sister, uncle and niece, or aunt and nephew. (Domestic Relations Law § 5; see Goodridge, 440 Mass at 319-320, 798 NE2d at 952-953.) It would be absurd to suggest that, by failing to expressly bar same-sex marriages, such as those between brother and brother, sister and sister, uncle and nephew, or aunt and niece, the Legislature was, in fact, authorizing such marriages.
As the Attorney General suggested in his opinion, the reason that there is no mention of same-sex marriage in the Domestic Relations Law, or in the legislative history thereof, appears to be that the Legislature had no experience with such marriage at the time of enactment and amendment of the relevant statutes. (Atty Gen Op at 7-11.) This court concludes that, notwithstanding the absence of an express exclusion, the Domestic Relations Law does not authorize same-sex marriage. The same conclusion was recently reached in Matter of Shields v Madigan (5 Misc 3d 901 [Sup Ct, Rockland County 2004]) and in Samuels v New York State Dept. of Health (Sup Ct, Albany County, Dec. 7, 2004, Teresi, J, Index No. 1967-04).
Defendant and amici[16] contend that such conclusion is dispositive because this court is foreclosed from considering plaintiffs’ *471 constitutional claims by the decision of the Appellate Division, Second Department, in Matter of Cooper (187 AD2d 128 [2d Dept 1993], affg 149 Misc 2d 282 [Sur Ct, Kings County 1990], appeal dismissed 82 NY2d 801 [1993]). This is not the case. Significantly, the Court in Cooper was not presented with the precise issue before this court: whether a bar on same-sex couples entering into a civil marriage violates the State Constitution. Rather, the central issue before the Cooper court was whether the surviving partner of an unmarried same-sex couple has the same right granted to a “surviving spouse” pursuant to EPTL 5-1.1 to elect against the decedent’s will. The Appellate Division held that the surviving partner of the unmarried same-sex couple did not have the right of a “surviving spouse,” within the meaning of EPTL 5-1.1, and that no constitutional rights have been abrogated or violated in so holding.[17] (Matter of Cooper, 187 AD2d at 134-135.)
Cooper thus involved the conflicting interests of two gay claimants to a decedent’s estate, not a constitutional claim to the right to marry. For this reason, the Attorney General opined, and this court agrees, that Cooper is “of limited utility” to the issue of whether the Domestic Relations Law’s restriction of marriage to opposite-sex couples is unconstitutional. (Atty Gen Op at 14.)
Furthermore, both the lower court and the Appellate Division in Cooper relied on Baker v Nelson (291 Minn 310, 191 NW2d 185 [1971]),[18] which only addressed whether the Minnesota domestic relations laws violated the United States Constitution. Here, because plaintiffs have raised state constitutional claims, as discussed below, New York law requires an independent analysis of state constitutional provisions. (See e.g. People v Kern, 75 NY2d 638 [1990].) Accordingly, Cooper does not bar this court *472 from entertaining plaintiffs’ state constitutional challenges to the Domestic Relations Law.[19]
Moreover, more recently, the term “spouse,” as it appears in EPTL 4-1.1 (governing distribution of a decedent’s estate) has been construed to include the surviving member of an unmarried, same-sex, Vermont civil union. (See Langan v St. Vincent’s Hosp. of N.Y., 196 Misc 2d 440 [Sup Ct, Nassau County 2003], distinguishing Raum v Restaurant Assoc., 252 AD2d 369 [1st Dept 1998] [surviving member of same-sex relationship not “spouse”].)
Defendant and amici also contend that this court’s consideration of plaintiffs’ constitutional challenge is barred by the United States Supreme Court’s dismissal of the appeal in Baker v Nelson (409 US 810 [1972]), for want of a substantial federal question. In the underlying appealed decision, the Minnesota Supreme Court had held that neither the Federal Equal Protection Clause, nor the Federal Due Process Clause, barred the denial of the right to marry to same-sex couples.[20] While the Supreme Court’s dismissal of an appeal is a ruling that the judgment appealed from is correct, it does not reflect agreement as to the merits of the constitutional question addressed. (See Washington v Confederated Bands & Tribes of Yakima Indian Nation, 439 US 463 [1979]; Massachusetts Bd. of Retirement v Murgia, 427 US 307, 308-309 n 1 [1976] [“cursory consideration” of issue in case summarily decided does not foreclose subsequent fuller consideration of same issue].) Accordingly, the dismissal of an appeal lacks the precedential value of decisions *473 reached after briefing and oral argument on the merits. (Washington v Confederated Bands, 439 US 463 [1979], supra.)
Moreover, New York law requires an independent analysis of state constitutional provisions, even when those provisions are identical to provisions in the Constitution of the United States, and a state court may find the state provision to prohibit conduct that has not been held to be prohibited by the corresponding federal provision. (See e.g. People v Kern, 75 NY2d 638 [1990] [barring criminal defendant from peremptorily challenging prospective jurors on basis of race].) Accordingly, this court is not foreclosed from considering the state constitutional issues raised herein. Thus, this court respectfully differs with the conclusion of the Samuels court that Baker v Nelson is dispositive on the issue of whether the exclusion of same-sex couples from civil marriage implicates a fundamental right.
Notably, New York’s Attorney General has acknowledged that the Domestic Relations Law’s restriction of marriage to opposite-sex couples “raises constitutional concerns, which are best resolved by the courts of this State.” (Atty Gen Op at 27.)[21] C. Plaintiffs Raise State Constitutional Due Process and Equal Protection Claims
This court now turns to the constitutional issues that plaintiffs raise: whether the restriction of marriage to only opposite-sex couples violates the Due Process and/or the Equal Protection Clause of New York’s Constitution.
As a threshold matter, this court notes that the protections of the New York Constitution extend beyond those found in the Federal Constitution, which sets the floor, but not the ceiling, for the rights of the individual.[22] (See People v LaValle, 3 NY3d 88, 129 [2004] [“ ‘on innumerable occasions this (C)ourt has *474 given . . . (the) State Constitution an independent construction, affording the rights and liberties of the citizens of this State even more protection than may be secured under the United States Constitution’ ”], quoting Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 159 [1978]; see also Cooper v Morin, 49 NY2d 69, 79 [1979].)
Further, where state law interferes with liberty rights, it is the role of the court to scrutinize the challenged legislative act. (See Matter of Jacobs, 98 NY 98, 110 [1885].) The New York Court of Appeals reiterated this vital judicial obligation recently in declaring that a provision of the Criminal Procedure Law violated the state guarantee of due process: “The Court . . . plays a crucial and necessary function in our system of checks and balances. It is the responsibility of the judiciary to safeguard the rights afforded under our State Constitution.” (People v LaValle, 3 NY3d at 128.)
Here, plaintiffs contend that the Domestic Relations Law’s bar against same-sex marriage violates the New York Constitution’s Due Process and Equal Protection Clauses. This court will first address the due process claim.
1. Plaintiffs’ Claim that the Restriction on Same-Sex Marriage Violates Fundamental Due Process Protections
Article I, § 6 of the State Constitution provides, in pertinent part, that “[n]o person shall be deprived of life, liberty or property without due process of law.” For plaintiffs’ argument to bear any weight, the right to marry must be a right cognizable under and within the intended ambit of protections of the Due Process Clause. The United States Supreme Court has made clear that the right to marry is a liberty right:
“Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education . . . These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.” (Planned Parenthood *475 of Southeastern Pa. v Casey, 505 US 833, 851 [1992] [emphasis supplied].)
Indeed, the Supreme Court has consistently protected marital and family relationships from governmental interference. (See Loving, 388 US 1 [1967], supra [holding that Virginia’s statutory scheme to prevent marriages between persons solely on the basis of racial classifications violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment]; see also Matter of Doe v Coughlin, 71 NY2d 48, 63 [1987, Alexander, J., dissenting], rearg denied 70 NY2d 1002 [1988], cert denied 488 US 879 [1988], citing Roe v Wade, 410 US 113 [1973] [abortion]; Eisenstadt v Baird, 405 US 438 [1972] [contraception]; Loving v Virginia, 388 US 1 [1967] [interracial marriage]; Griswold v Connecticut, 381 US 479 [1965] [contraception]; Prince v Massachusetts, 321 US 158 [1944] [family relationships]; Skinner v Oklahoma, 316 US 535 [1942] [procreation]; Pierce v Society of Sisters of Holy Names of Jesus & Mary, 268 US 510 [1925] [child rearing]; Turner v Safley, 482 US 78 [1987] [prisoners do not relinquish the fundamental right to marry upon being incarcerated]; Zablocki v Redhail, 434 US 374 [1978] [holding that a Wisconsin statute requiring all child support payments to be made before one could receive a marriage license violated the 14th Amendment].)
The right to liberty necessarily includes the right to be free from unjustified government interference in one’s privacy. (See People v Onofre, 51 NY2d 476 [1980].) Thus, the analysis of plaintiffs’ due process claim begins with the question of whether the right to marriage is a fundamental right entitled to due process protection, both as a liberty right generally and, more specifically, as a privacy right.
a. The Due Process Right to Liberty Protects the Right to Marry
Under both the Federal and New York State Constitutions, it is beyond question that the right to liberty, and the concomitant right to privacy, extend to protect marriage. The United States Supreme Court has long recognized the fundamental importance of marriage. As early as 1888, in Maynard v Hill (125 US 190, 205, 211 [1888]), the Supreme Court stated that marriage “creates] the most important relation in life” and is “the foundation of the family and of society, without which there would be neither civilization nor progress.”
In 1923, the Supreme Court in Meyer v Nebraska (262 US 390, 399 [1923]) recognized that the right “to marry, establish a home and bring up children” is a central part of the liberty
*476 protected by the Due Process Clause.[23] Nineteen years later, in Skinner v Oklahoma (316 US at 541 [1942]), it described marriage as “fundamental to the very existence and survival of the race.” In 1967, the Loving court recognized marriage as a fundamental right under the Constitution, striking down the state’s anti-miscegenation statute: “The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men . . . Marriage is one of the ‘basic civil rights of man,’ fundamental to our very existence and survival.” (388 US at 12, quoting Skinner, supra at 541.)[24]
One decade later, in Zablocki v Redhail[25] (434 US at 384 [1978]), the Court reaffirmed its holding in Loving, stating that “[although Loving arose in the context of racial discrimination, prior and subsequent decisions of this Court confirm that the right to marry is of fundamental importance for all individuals.”
Furthermore, the Supreme Court has noted that marriage is a
“right of privacy older than the Bill of Rights — older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.” (Griswold v Connecticut, 381 US at 486 [emphasis supplied].)
The Supreme Court has “long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.” (Cleveland Bd. of Educ. v LaFleur, 414 US 632, 639-640 [1974]; see also Zablocki, 434 US at 384, quoting Griswold, 381 US at 486 supra.) As stated by the Supreme Court: “At the heart of liberty is the right to define one’s own concept of existence, of meaning, of the universe, and *477 of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.” (Lawrence v Texas, 539 US 558, 574 [2003], quoting Planned Parenthood of Southeastern Pa. v Casey, 505 US at 851.) The Court further emphasized that “[t]hese matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.” (Id.)
New York courts have analyzed the liberty interest at issue in terms that recognize and embrace the broader principles at stake. The Court of Appeals, in holding unconstitutional New York’s consensual sodomy prohibition, did not define the nature of the claim with such specificity as to obscure the real right at stake (such as, for example, defining the claim as a “fundamental right” to engage in nonmarital “oral sodomy in an automobile parked on” a city street). (People v Onofre, 51 NY2d at 484.) Instead, the Court’s review of the constitutional deprivation focused on the individual’s broader liberty interest, a “fundamental right of personal decision” extending to nonmarital sexual intimacy. (Id. at 486.)[26]
Likewise, in Cooper v Morin (49 NY2d 69 [1979], supra), in striking down a prohibition on contact visits for pretrial detainees, the Court of Appeals did not dismiss the interest at stake as some claimed “fundamental right” of accused felons to receive contact visits while incarcerated. The Court instead recognized that “the fundamental right to marriage and family life” that all share applies to pretrial detainees and requires the government to allow contact visits with family members. (Id. at 80.)
Indeed, as the Court of Appeals has consistently made clear, “[A]mong the decisions protected by the right to privacy, are those relating to marriage.” (Matter of Doe v Coughlin, 71 NY2d at 52; see also People v Shepard, 50 NY2d 640, 644 [1980] [noting courts’ willingness “to strike down State legislation which invaded the ‘zone of privacy’ surrounding the marriage rela *478 tionship”] [citation omitted]; Levin v Yeshiva Univ., 96 NY2d 484, 500 [2001, Smith, J., concurring] [“marriage is a fundamental constitutional right”]; Matter of Oakknoll v Coughlin, 101 AD2d 931, 932 [3d Dept 1984] [“the right to marry is one of fundamental dimension”].)
The New York Court of Appeals has explained that the right of privacy protects against unwarranted governmental interference with personal decisions relating to marriage:
“As to the right of privacy . . it is a right of independence in making certain kinds of important decisions, with a concomitant right to conduct oneself in accordance with those decisions, undeterred by governmental restraint — what we referred to . . . as ‘freedom of conduct’. . .
“[T]he Supreme Court took pains in Carey v Population Servs. Int[l]. (431 US 678, 684-685) to observe that ‘the outer limits’ of the decision-making aspect of the right of privacy ‘have not been marked by the Court’, noting however that ‘among the decisions that an individual may make without unjustified government interference’ are personal decisions relating to marriage. (Loving v Virginia, 388 US 1, 12, supra)” (Onofre, 51 NY2d at 485-486 [citations omitted and additional emphasis supplied]).
As other states have also observed, the right to marry “is not a privilege conferred by the State, but a fundamental right that is protected against unwarranted State interference.” (Goodridge v Department of Pub. Health, 440 Mass at 345, 798 NE2d at 970 [Greaney, J., concurring].) “[I]t is a fundamental right of free men.” (Perez v Sharp, 32 Cal 2d at 714, 198 P2d at 19.)
b. Defining the Protected Marriage Rights
Having established that due process liberty and privacy protections extend to marriage, this court must next determine what interests are specifically protected, and whether the statutes in question interfere with plaintiffs’ protected interests. This court concludes that there are two specific protected interests to consider.
The first bears on who may lawfully enter into a marriage relationship. (See Turner v Safley, 482 US at 94-95 [decision to marry is a constitutionally protected fundamental right available to prison inmates]; Zablocki v Redhail, 434 US 374 [1978], supra [men who fail to meet support obligation to their child by previous marriage or liaison have constitutional right to *479 remarry, without statutorily required court order].) However, the right to enter into a marriage is not at issue here. The Domestic Relations Law does not bar any of the 10 plaintiffs from entering into a civil marriage.
The second aspect of the fundamental right to marry, which is what this action concerns, is the right to choose whom one marries. The right to choose one’s spouse “resides with the individual.” (See Loving, 388 US at 12 [freedom to marry embraces the choice to select a partner across racial lines which cannot be infringed by state]; Perez, 32 Cal 2d 711, 198 P2d 17, supra [same]; Goodridge, 440 Mass 309, 798 NE2d 941, supra [freedom to marry person of same sex].) “[T]he right to marry means little if it does not include the right to marry the person of one’s choice” (Goodridge, 440 Mass at 327-328, 798 NE2d at 958; see also Perez, 32 Cal 2d at 715, 198 P2d at 19 [“right to marry is the right to join in marriage with the person of one’s choice”]; Brause v Bureau of Vital Statistics, 1998 WL 88743, *6 [Alaska Super Ct, Feb. 27, 1998] [deciding whom to marry is a fundamental right, whether decision results in traditional or nontraditional choice], superseded by Alaska Const, art I, § 25 [eff Jan. 3, 1999] [providing that a valid marriage “may exist only between one man and one woman”]).
That the right to choose one’s life partner is fundamental to the right of privacy has been made clear by the Court of Appeals. In Crosby v State of N.Y., Workers’ Compensation Bd. (57 NY2d 305, 311-312 [1982]), the Court of Appeals observed that, while the “precise contours” of the right to privacy
“have yet to be defined, it is clear that it has application in two primary areas of personal autonomy. ‘the individual interest in avoiding disclosure of personal matters’, and ‘the interest in independence in making certain kinds of important decisions’ . . . “The cases according constitutional protection to such individual decision-making interests indicate that this aspect of the right of privacy is limited to the most personal and intimate matters of individual choice of conduct. Thus, clearly falling within its scope are matters relating to the decision of whom one will marry.” (Citations omitted and emphasis supplied.)
Here, the right sought by plaintiffs, the “personal autonomy” to decide “the most personal and intimate matter of individual choice of conduct” — whom one will marry — clearly falls squarely *480 within the contours of the right of privacy articulated in Crosby (57 NY2d at 311-312). The Court of Appeals has specifically stated: “[T]he government [is] prevented from interfering with an individual’s decision about whom to marry.” (People v Shepard, 50 NY2d 640, 644 [1980]; see also Matter of Doe v Coughlin, 71 NY2d at 52 [“The right to privacy, in constitutional terms, involves freedom of choice, the broad, general right to make decisions concerning oneself and to conduct oneself in accordance with those decisions free of governmental restraint or interference”].)
Because the exclusion of same-sex couples from eligibility for civil marriage infringes the fundamental right to choose one’s spouse, such exclusion may be sustained only if it serves a compelling state interest. The Supreme Court has consistently reaffirmed that, since the freedom to marry is a fundamental right, restrictions that “significantly interfere with decisions to enter into the marital relationship” are subject to “rigorous scrutiny” and “cannot be upheld unless . . . supported by sufficiently important state interests . . . closely tailored to effectuate only those interests.” (Zablocki, 434 US at 386-388.)
Under the strict scrutiny standard, the State must demonstrate “a compelling state interest” for the classification and show that the legislation is “narrowly tailored” to that interest. (See Washington v Glucksberg, 521 US 702, 720-721 [1997], quoting Reno v Flores, 507 US 292, 302 [1993]; see also, Rivers v Katz, 67 NY2d 485, 498 [1986] [“due process requires that a court balance the individual’s liberty interest against the State’s asserted compelling need on the facts of each case to determine” whether to override “an individual’s fundamental right” to refuse medication].)
c. No Compelling State Interests Require a Bar on Same-Sex Marriage
Defendant identifies the following two state interests as purportedly supporting the exclusion of same-sex couples from marriage: fostering the traditional institution of marriage and avoiding the problems that might arise from a refusal by other jurisdictions to recognize the validity of same-sex marriages, even those which are valid where they are entered into. These asserted state interests will be considered in turn.
i. Tradition as a State Interest
Both the New York Court of Appeals and the United States Supreme Court have made clear that the State may not deny rights to a group of people based on no more than traditional *481 attitudes or disapproval of that group. In People v Liberta (64 NY2d 152 [1984], cert denied 471 US 1020 [1985]), the Coqrt of Appeals rejected anachronistic views about the subservient role of a woman relative to her husband as the rational basis for the marital rape exception. (Id. at 164.) Similarly, in Onofre (51 NY2d at 490), the Court of Appeals, in striking down New York’s sodomy law, stressed that “disapproval by a majority of the populace . . . may not substitute for the required demonstration of a valid basis for intrusion by the State in an area of important personal decision protected under the right of privacy.” (See also Romer v Evans, 517 US 620, 633-635 [1996] [holding that a singular desire to “disadvantag(e) the group burdened by (a) law,” namely, gay men and lesbians, was not a “legitimate purpose or . . . objective”]; Lawrence v Texas, 539 US at 571, 578 [holding that although “for centuries there have been powerful voices to condemn homosexual conduct as immoral,” such disapproval gives rise to “no legitimate state interest” in criminalizing same-sex intimate relations].)
The phrase “the traditional institution of marriage,” which defendant quotes from Justice O’Connor’s concurring opinion in Lawrence (539 US at 585), appears to refer not to marriage as a “traditional institution” (a formulation that would leave the nature of marriage open to new forms thereof), but rather, to the traditional form of the institution of marriage — confined to opposite-sex couples. In dictum, Justice O’Connor implied that the preservation of that traditional form could be a rational reason to bar same-sex marriage. (Id at 585.) The issue of same-sex marriage, however, was not before the Court. Nonetheless, the three Justices who dissented in Lawrence, and who were the only Justices to address Justice O’Connor’s parenthetical remark, pointed out that the phrase “ ‘preserving the traditional institution of marriage’ is just a kinder way of describing the State’s moral disapproval of same-sex couples.” (Lawrence, 539 US at 601 [Scalia, Ch. J., and Thomas, J., dissenting].) It is clear that moral disapproval of same-sex couples or of individual homosexuals is not a legitimate state purpose or a rational reason for depriving plaintiffs of their right to choose their spouses. (See Romer v Evans, 517 US 620 [1996].) In weighing the significance of the traditional institution of marriage, one must take into account the Supreme Court’s rejection of the elements of distaste or moral disapproval. (See Lawrence, 539 US at 583.)
Defendant notes that marriage, as “a union of man and a woman, uniquely involving the procreation and, rearing of chil *482 dren within a family, is as old as the book of Genesis” (quoting Matter of Cooper, 187 AD2d at 133). Plaintiffs do not dispute such premise. However, it is also indisputable that the Domestic Relations Law does not bar women who are past childbearing age to marry, and that the long-term union of a man and a woman is no longer the only familial context for raising children. Plaintiffs Shain and Abrams are among the millions of lesbian mothers residing with their children in the United States, and among the many thousands who have conceived through donor insemination. (See Baker v State, 170 Vt 194, 217, 744 A2d 864, 881 [1999], and the studies cited there.) “It is a fact that children are being born to single-sex families on a biological basis, and that they are being so born in considerable numbers.” (Baker, 170 Vt at 218, 744 A2d at 882, quoting E. Shapiro and L. Schultz, Single-Sex Families: The Impact of Birth Innovations Upon Traditional Family Notions, 24 J Fam L 271, 281 [1985].)
Further, plaintiffs Kennedy, Robinson, and Freeman-Tweed are among the many persons in same-sex relationships who have adopted their partner’s children. Such parenting arrangements are all permitted by New York law; applications for adoption may not be denied on the basis of the applicant’s sexual orientation. (18 NYCRR 421.16 [h] [2]; Matter of Anonymous, 209 AD2d 960 [4th Dept 1994].) The unmarried partner of a child’s biological mother may adopt the child, regardless of that partner’s sexual orientation. (Matter of Jacob, 86 NY2d 651 [1995].) Same-sex couples may adopt jointly. (Matter of Carolyn B., 6 AD3d 67 [4th Dept 2004].) As amici concede (amici brief at 21) and a dissenting judge in Goodridge acknowledged, “heterosexual intercourse, procreation, and child care are not necessarily conjoined.” (Goodridge, 440 Mass at 382, 798 NE2d at 995 [Cordy, J., dissenting].)
While eloquently praising the indisputably central role that marriage plays in human life, neither defendant nor amici indicate how that role would be diminished by allowing same-sex couples to marry, nor how the marriages of opposite-sex couples will be adversely affected by allowing same-sex couples to marry. As one court concluded in recently recognizing a right to marriage for same-sex couples under the Washington Constitution:
“Some declaim that the institutions of marriage and family are weak these days and, in fact, stand threatened. Any trial court judge who regularly *483 hears divorce, child abuse and domestic violence cases deeply shares this concern. It is not difficult, however, to identify both the causes of the present situation and the primary future threat. They come from inside the institution, not outside of it. Not to be too harsh, but they are a shortage of commitment and an excess of selfishness. Before the Court stand eight couples who credibly represent that they are ready and willing to make the right kind of commitment to partner and family for the right kinds of reasons. All they ask is for the state to make them able . . .
“There is no worthwhile institution that they would dishonor, much less destroy.” (Andersen v King County, 2004 WL 1738447, *8, 12 [Wash Super Ct, Aug. 4, 2004].)
Excluding same-sex couples from marrying may, in fact, undermine the State’s interest in providing optimal environments for child-rearing, in that children of those families are then not afforded the same legal, financial and health benefits that children of married couples receive.
Furthermore, as explained in more detail below, the concept of marriage has steadily evolved beyond a rigid static “historical” definition.[27]
ii. Ensuring Consistency with Federal Law and Other States as a State Interest
At its root, defendant’s second argument is that the State may excuse its own deprivation of plaintiffs’ constitutional rights on the basis of discrimination countenanced by other states and the federal government. But this simply cannot be a legitimate ground for denying a liberty interest as important as marriage. Indeed, if the California Supreme Court had been so constrained, it would never have struck down the bar on interracial marriage. (Perez v Sharp, 32 Cal 2d 711, 198 P2d 17, supra.)
Defendant’s argument is based upon the federal Defense of Marriage Act (DOMA) (1 USC § 7; 28 USC § 1738C), and on similar statutes passed by many states (mini DOMAs). The DOMA (1 USC § 7) provides that in all federal statutes and regulations, “the word ‘marriage’ means only a legal union between one man and one woman as husband and wife, and the *484 word ‘spouse’ refers only to a person of the opposite sex who is a husband or a wife.” The DOMA further provides that:
“No State . . . shall be required to give effect to any public act, record, or judicial proceeding of any other State . . . respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State . . . , or a right or claim arising from such relationship.” (28 USC § 1738C.)
Accordingly, as defendant notes, if persons of the same sex are allowed to marry in New York, such persons and their children will encounter legal difficulties and disabilities that married persons of opposite sexes do not encounter, resulting from the failure of other states and the federal government to recognize such marriages. Defendant claims that such difficulties and disabilities may range from one spouse being ineligible for his or her same-sex spouse’s Social Security benefits to the impossibility of enforcing a New York support order against a same-sex spouse who has moved to a state that has enacted a mini DOMA.
However, the reality is that significant numbers of couples in New York have formed same-sex families, and numerous couples will continue to do so, whether they are allowed to marry or not. Neither defendant nor amici contend otherwise. It would be “irrational and perverse” (Carey v Population Servs. Intl., 431 US 678, 715 [1977] [Stevens, J., concurring]) to deny such New York resident couples and their children the protections of marriage that they would enjoy under the laws of New York, on the ground that they will not have those protections under the laws of other states, or under those of the United States.[28] Any conflicts plaintiffs may face if they travel out of state, or rights which they will not receive from the federal government, pale beside the tremendous protections and rights that access to marriage would provide for plaintiffs and their families under this State’s laws, ranging from rights in times of emergency, protections for children raised in the family, financial protections and rights on the death of a spouse.[29]
*485 In fact, an elaborate body of comity law already exists nationwide to deal with inconsistency in state laws regarding marriage. (See e.g. Van Voorhis v Brintnall, 86 NY 18, 25-27 [1881] [describing widespread application of comity principles to address differences in marriage laws among states and nations].)
Indeed, the Court of Appeals has rejected the notion that the goal of uniformity must take precedence over the robust individual protections provided to New Yorkers under the State’s Constitution. (See e.g. People v P.J. Video, 68 NY2d 296, 304 [1986] [even in areas like search and seizure law, where the Court has indicated some preference for consistent federal and state policies, the Court has held that “(w)hen weighed against the ability to protect fundamental constitutional rights, the practical need for uniformity can seldom be a decisive factor”].)
It is clear that “the right of the individual to contract ... to marry ... [is a] liberty [which] may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect.” (Meyer v Nebraska, 262 US at 399-400.) Thus, this court finds this claimed state interest — the protection of same-sex couples from the effects of the lack of comity — not to be a rational, let alone a compelling, state interest. Indeed, it would be a “grave disservice” to residents of New York State, and this court’s constitutional duty to interpret the law, “to conclude that the strong protection of individual rights” guaranteed by this State’s Constitution “should not be available to their fullest extent” in this state, simply because “those rights may not be acknowledged elsewhere.” (See Opinions of Justices to Senate, 440 Mass 1201, 1209, 802 NE2d 565, 571 [2004] [Goodridge II].)[30]
*486 Accordingly, this court concludes that the challenged statutes unconstitutionally deprive plaintiffs of the fundamental liberty interest in choosing one’s spouse.
d. Defendant’s Argument that Plaintiffs Must Establish a Fundamental Right to Same-Sex Marriage is Not Persuasive
For purposes of due process analysis, the question is not, as defendant and amici formulate it, whether same-sex marriage is so rooted in our traditions that it is a fundamental right (it is not so rooted, of course). Indeed, to ask whether same-sex marriage is a fundamental right is to make the mistake that the Supreme Court criticized in Lawrence (539 US at 558), when it overruled Bowers v Hardwick (478 US 186 [1986]). The Bowers court had begun its substantive discussion of whether a Georgia statute making it a criminal offense to engage in sodomy was unconstitutional by stating: “The issue presented is whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy” (Lawrence, 539 US at 566, quoting Bowers, 478 US at 190). The Lawrence court explained that such formulation of the issue “discloses the Court’s failure to appreciate the extent of the liberty at stake.” (Id. at 558.) In Lawrence, the Supreme Court made clear that the question that the Bowers court should have asked was whether consensual sodomy between adults was embraced by the “constitutional protection [afforded] to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education.” (Lawrence, 539 US at 574.) Similarly, in the present case, the “liberty at stake” that is fundamental is the freedom to choose one’s spouse. (See id. at 567.) Thus, for the State to deny that freedom to an individual who wishes to marry a person of the same sex is to deny that individual the fundamental right to marry. (See Loving, 388 US at 12.)
As the Washington Superior Court pointed out, in overturning Washington’s Defense of Marriage Act (which explicitly barred same-sex marriage), there was no fundamental right to interracial marriage at the time (1967) that Loving was decided (much less in 1948, almost two decades before, when the California Supreme Court decided Perez), and there was no fundamental right for inmates to marry at the time that Turner v Safley (482 US 78 [1987], supra) was decided. (Castle v State, 2004 WL 1985215, *12 [Wash Super Ct, Sept. 7, 2004].) In each of those cases, the courts held that the basic fundamental right to marry should properly be seen as including the rights that *487 each of the plaintiffs in those respective cases sought to assert, rather than merely establishing a right limited by the infringement complained of. If that were the case,
“[t]he Court’s opinion [in Loving] could have rested solely on the ground that the statutes discriminated on the basis of race in violation of the Equal Protection Clause. But the Court went on to hold that the laws arbitrarily deprived the couple of a fundamental liberty protected by the Due Process Clause, the freedom to marry . . .
“Although Loving arose in the context of racial discrimination, prior and subsequent decisions of this Court confirm that the right to marry is of fundamental importance for all individuals.” (Zablocki v Redhail, 434 US at 383-384 [emphasis supplied].)
Defendant notes that one of the stated purposes of the federal welfare program, Temporary Assistance to Needy Families (42 USC § 601 et seq.), is the reduction in out-of-wedlock births, and the fostering of conditions such that children will live in two-parent families. As this court is not the first to recognize, extending civil marriage to same-sex couples would actually foster these goals, rather than undermine them, and it would reinforce the importance of marriage in creating stable relationships and two-parent families for the raising of children. (See Goodridge, 440 Mass at 337, 798 NE2d at 965; Baker, 170 Vt at 247, 744 A2d at 902 [Johnson, J., concurring].) Defendant’s historical argument is no less conclusory than amici’s tautological argument that same-sex marriage is impossible, because, as a matter of definition, “marriage” means, and has always meant, the legal union of a man and a woman. Further, the premise of that argument is factually wrong; polygamy has been practiced in various places and at various times, for example, in the Territory of Utah. (See Davis v Beason, 133 US 333 [1890]; Genesis 29:21-30; Deuteronomy 21:10-17.)
Moreover, even if the premise of amici’s argument were correct, the conclusion that amici draw from it would be invalid. “[I]t is circular reasoning, not analysis, to maintain that marriage must remain a heterosexual institution because that is what it historically has been.” (Goodridge, 440 Mass at 332 n 23, 798 NE2d at 961 n 23; see Halpern v Attorney Gen. of Can., 172 OAC 276 ¶ 71 [2003] [“(A)n argument that marriage is heterosexual because it ‘just is’ amounts to circular reasoning. It *488 sidesteps the entire analysis”] [holding that exclusion of same-sex couples from marriage violates Canadian Charter of Rights and Freedoms]; Baehr v Lewin, 74 Haw 530, 565, 852 P2d 44, 61 [1993] [argument that “the right of persons of the same sex to marry one another does not exist because marriage, by definition and usage, means a special relationship between a man and a woman” deemed “circular and unpersuasive”].)
Marriage is no more limited by the historical exclusion of same-sex marriage than it was limited by the exclusion of interracial marriage, the legal doctrine of coverture (see, 41 Am Jur 2d, Husband and Wife § 2), the pre-1967 restrictions on remarriage following divorce in New York (see Domestic Relations Law § 8), long-standing restrictions on divorce, or the “marital exemption” to the crime of rape.[31]
In fact, history demonstrates that marriage is not a stagnant institution. Prior to the 19th century, marriage in New York, as elsewhere here and abroad, was synonymous with the longstanding common-law doctrine known as “coverture”: by marriage, the husband and wife are one person in law; that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband under whose wing, protection, and cover, she performs everything. (1 Blackstone, Commentaries on Laws *489 of England, at 442-443; see Briggs v Mitchell, 60 Barb 288, 311 [Sup Ct, NY County 1864] [marriage effects “suspension of the legal existence of woman”].) In the mid-1800’s, New York, like many states, began the more than century-long process of altering the age-old marital relationship by dismantling the entrenched tradition of coverture and evolving in its stead a legal marriage structure premised on full equality between the sexes. This ranged from permitting married women to retain legal rights to their property and earnings, “a clear innovation upon the marital rights of the husband at common law” (Gage v Dauchy, 34 NY 293, 296 [1866]), to eliminating the husband’s unilateral “property interest” in his wife’s body. (Oppenheim v Kridel, 236 NY 156, 161 [1923] [rejecting as “archaic” the view “that (a husband) had a property interest in (his wife’s) body and a right to the personal enjoyment of his wife”].)
As indicated above, the institution of marriage has evolved over time. In fact, in 1966, New York changed another important aspect of marriage through the enactment of the Divorce Reform Law, permitting for the first time “non-fault” divorce in the state. (See L 1966, ch 254.) New York’s earlier divorce law had severely limited the circumstances under which the parties to a marriage could terminate their union. (Palmer v Palmer, 1 Paige Ch 276, 277 [1828] [“It would be aiming a deadly blow at public morals to decree a dissolution of the marriage contract merely because the parties requested it”].) There has clearly been a steady evolution in the institution of marriage throughout history, which belies the concept of a static traditional definition.
Moreover, the exclusionary history of civil marriage does not, without more, either foreclose or decide the constitutional questions that plaintiffs have raised. The United States Supreme Court has recently explained that “times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.” (Lawrence, 539 US at 579.)
“To define the institution of marriage by the characteristics of those to whom it always has been accessible, in order to justify the exclusion of those to whom it never has been accessible, is conclusory and bypasses the core question [before the court].” (Goodridge, 440 Mass at 348, 798 NE2d at 972-973 [Greaney, J., concurring]; see also Brause, 1998 WL 88743, *2 [1998].) Where important liberty interests are at stake, “history *490 and tradition are the starting point but not in all cases the ending point” of the constitutional analysis. (Lawrence, 539 US at 572 [citation omitted].)
Permitting plaintiffs to marry would confer innumerable tangible and intangible benefits for them and their children while causing harm to no one. Defendant has articulated no legitimate state purpose that is rationally served by a bar to same-sex marriage, let alone a compelling state interest in such a bar. To the extent that the Domestic Relations Law bars plaintiffs from obtaining a license to marry, the Domestic Relations Law violates plaintiffs’ due process rights under article I, § 6 of the New York State Constitution.
2. Plaintiffs’ Claim that the Restriction on Same-Sex Marriage Violates Equal Protection
In addition to due process, plaintiffs raise an equal protection claim under the State Constitution. Article I, § 11 of the State Constitution provides, in pertinent part, that “[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof.”
Plaintiffs argue that their exclusion from marriage to each other constitutes discrimination on the basis of sex, because each of them, were he or she of the other sex, would be free to marry his or her partner. Plaintiffs’ argument is supported by Brause (1988 WL 88743 [1988], supra), Baehr v Lewin (74 Haw 530, 852 P2d 44 [1993]), by Judge Greaney’s concurrence in Goodridge (440 Mass 309, 798 NE2d 941, supra), and by Judge Johnson’s concurrence in Baker (170 Vt 194, 744 A2d 864, supra). Plaintiffs acknowledge, however, that the exclusion of same-sex marriage treats men and women in exactly the same way. Nevertheless, the equal application of a statute to two groups does not necessarily insulate that statute from attack on equal protection grounds. As in Loving (388 US 1 [1967], supra), the anti-miscegenation law at issue was applied equally to whites and others (both of the Lovings had been convicted under the subject law), nonetheless, the Supreme Court had no difficulty concluding that the law had been enacted with invidious discriminatory intent. Here, however, there is no evidence that the Legislature had a specific intent to bar same-sex marriage. Moreover, with the gradual equalization of the rights of men and women in marriage, it cannot be readily argued that the requirement that a married couple consist of a man and a woman is intended to, or does, reinforce traditional sex roles.
This court, however, need not decide whether the exclusion of same-sex couples from the institution of civil marriage discrimi *491 nates against each of the persons in those couples on the basis of sex. The exclusion of plaintiffs from entering into civil marriage indisputably discriminates against them on the basis of sexual orientation. Sexual orientation “cannot be used as the basis for denying ‘any person’ the equal protection of the law.”[32] (Under 21 v City of New York, 108 AD2d 250, 256 [1st Dept 1985], mod on other grounds 65 NY2d 344 [1985].)[33] As discussed above, defendant has not presented even a legitimate state purpose that is rationally served by barring same-sex marriage. Accordingly, this court concludes that defendant’s denial of plaintiffs’ requests for marriage licenses violated plaintiffs’ right to the equal protection of the law.
D. New York’s Evolving Commitment to Protect and Respect Same-Sex Relationships
Recognition that the right to choice in marriage applies to all people, including gays and lesbians, is consistent not only with the changing definition and purposes of marriage, but also with New York’s evolving history of respect for, and protection of, same-sex relationships. The 2000 United States Census identified 46,490 households of same-sex partners in New York State, with over 34% of the lesbian couples and 21% of the gay couples raising children in the home.[34] New York, through its courts, Legislature, executive branch, and local governments, has acknowledged that the state’s thousands of same-sex couples fit the definition of “family”; that they are able to provide a loving and stable home for their biological or adoptive children; and *492 that they are entitled to benefit from the same rights accorded to married couples.
Recent decisions of the New York Court of Appeals and other New York courts evince an evolving public policy favoring the recognition of rights for committed same-sex couples. For example, the Court of Appeals has upheld second-parent adoptions as a means of creating a legal relationship between the nonbiological or non-first-adoptive parent and his or her partner’s children. (Matter of Jacob, 86 NY2d 651 [1995] [allowing second-parent adoption by biological parent’s same-sex partner].)
Furthermore, in Braschi v Stahl Assoc. Co. (74 NY2d 201 [1989]), the Court of Appeals held that same-sex “lifetime partners whose relationship is long term and characterized by an emotional and financial commitment and interdependence” qualify as “family members” for purposes of the state rent control law. (Id. at 211.) The Court of Appeals stated that the definition of family “should find its foundation in the reality of family life,” rather than reliance on “fictitious legal distinctions or genetic history.” (Id.) The Court considered the fact that the same-sex couple “regarded one another, and were regarded by friends and family, as spouses.” (Id. at 213.) The Court acknowledged that gay partnerships “comport[ ] . . . with our society’s traditional concept of ‘family’ ” in granting a gay man the right to occupy his deceased same-sex partner’s rent-controlled apartment. (Id. at 211.) The First Department has extended Braschi to protect same-sex partners in rent-stabilized apartments (see East 10th St. Assoc. v Estate of Goldstein, 154 AD2d 142, 145 [1st Dept 1990]), and to reject a taxpayer challenge to New York City’s Domestic Partnership Law, Administrative Code § 3-240 et seq. (see Slattery v City of New York, 266 AD2d 24 [1st Dept 1999], appeal dismissed 94 NY2d 897 [2000], lv dismissed in part and denied in part 95 NY2d 823 [2000]).
More recently, in Langan v St. Vincent’s Hosp. (196 Misc 2d 440 [Sup Ct, Nassau County 2003]), the court allowed the surviving member of a same-sex couple who had entered into a civil union in Vermont to sue for wrongful death, noting that the couple ‘'lived together as spouses from shortly after they met in 1985 until the year 2000, when they took the first opportunity to secure legal recognition of their union in the State of Vermont, and were joined legally as lawful spouses.” (Id. at 442-443 [emphasis added].)
It has long been recognized that a gay or lesbian sexual orientation does not bear on fitness to parent children. (See *493 Guinan v Guinan, 102 AD2d 963, 964 [3d Dept 1984].) New York approves adoptions by lesbians and gay men. (18 NYCRR 421.16 [h] [2] [“Applicants (to adopt) shall not be rejected solely on the basis of homosexuality”]; Matter of Carolyn B., 6 AD3d 67, 68 [4th Dept 2004] [same-sex couples may adopt jointly]; Matter of Anonymous, 209 AD2d 960, 960 [4th Dept 1994] [“an application for adoption may not be precluded solely on the basis of homosexuality,” and “(i)n the context of child custody cases, ... a parent’s sexual orientation ... is not determinative”].) New York also permits gay and lesbian adults to serve as foster parents. (See e.g. Matter of Jessica N., 202 AD2d 320 [1st Dept 1994] [lesbian foster mother permitted to adopt in best interest of foster child].)
As this State’s Attorney General has recognized, “the New York Legislature has enacted numerous provisions barring discrimination and enhancing penalties for crimes involving animus on the basis of sexual orientation.” (Atty Gen Op at 19.) These enactments include the Sexual Orientation NonDiscrimination Act (SONDA) (L 2002, ch 2 [prohibiting discrimination on basis of sexual orientation in employment, education, and housing accommodations]) and Hate Crimes Act of 2000 (Penal Law § 485.05 [1] [a] [New York’s hate crimes law includes sexual orientation].)[35] “[W]hile other jurisdictions were enacting mini-DOMAs, New York State amended Civil Rights Law § 40-c regarding equal protection to prohibit discrimination on the basis of sexual orientation.” (Langan, 196 Misc 2d at 446.)
New York City has prohibited sexual orientation discrimination under its Human Rights Law since 1986. (Administrative Code § 8-101.) Numerous municipalities, including New York City, have established domestic partnership registries to accord some protections (although far fewer than would flow from access to civil marriage) to same-sex couples.[36]
The Governor and the Legislature have also issued multiple measures treating surviving partners of gay victims of the *494 September 11, 2001 World Trade Center attacks as surviving spouses.[37] More recently, the State has extended certain government benefits to same-sex partners.[38]
Thus, recognition that the right to choice in marriage is applicable to same-sex couples is consistent with the evolving public policy as demonstrated in recent decisions of the Court of Appeals and other New York courts, and actions taken by the State Legislature, the executive branch and local governments.
III. Remedy
Defendant and amici argue that, if plaintiffs and other same-sex couples are to be allowed to enter into civil marriages, such decision should be made by the Legislature, rather than by the courts. This “Legislature deference” argument was similarly used to urge the United States Supreme Court to uphold racial classifications in marriage in Loving v Virginia.[39]
As this court noted in its August 20, 2004 decision on a previous motion in this case, it is clear that the courts have jurisdiction to rule on the constitutionality of statutes. (Hernandez v Robles, supra.) “The role of the judiciary is to enforce statutes and to rule on challenges to their constitutionality either on their face or as applied in accordance with their provisions.” (Benson Realty Corp. v Beame, 50 NY2d 994, 996 [1980], appeal dismissed sub nom. Benson Realty Corp. v Koch, 449 US 1119 [1981].) As the New York Court of Appeals has recently reiter *495 ated: “The Court . . . plays a crucial and necessary function in our system of checks and balances. It is the responsibility of the judiciary to safeguard the rights afforded under our State Constitution.” (People v LaValle, 3 NY3d 88, 128 [2004].)
The remaining issue concerns the actual remedy. While this court holds that the Domestic Relations Law is unconstitutional insofar as it bars same-sex couples from marrying, it is well settled that a “statute should be construed when possible in a manner which would remove doubt of its constitutionality.” (People v Barber, 289 NY 378, 385 [1943].) The Court of Appeals has explained that:
“When a statute is constitutionally defective because of underinclusion, a court may either strike the statute, and thus make it applicable to nobody, or extend the coverage of the statute to those formerly excluded . . .
“[The] court’s task is to discern what course the Legislature would have chosen to follow if it had foreseen [the court’s] conclusions as to underinclusiveness.” (People v Liberta, 64 NY2d at 170-171; see also Matter of Rachelle L. v Bruce M., 89 AD2d 765 [3d Dept 1982] [replacing gender-specific language in section 532 of the Family Court Act]; Goodell v Goodell, 77 AD2d 684, 685 [3d Dept 1980] [reading Domestic Relations Law § 236 to include “wife,” as well as “husband,” concluding that the section could be purged of its sex-based discrimination because the statute could be read in a “gender-neutral manner (making it) applicable to either spouse”].)
It is possible that, had the Legislature foreseen this decision, it might have opted to offer civil unions to same-sex and opposite-sex couples alike, leaving the word “marriage” to unions solemnized by religious institutions (see Opinions of Justices to Senate, 440 Mass 1201, 1219 n 5, 802 NE2d 565, 578 n 5 [2004]). However, it is utterly inconceivable to this court that the Legislature would have rejected the entire marriage statutory scheme. Nor do plaintiffs advocate striking down the marriage provisions of the Domestic Relations Law. Indeed, such a remedy would be antithetical to the relief plaintiffs actually seek: access to the vitally important institution of marriage. (See Goodridge, 440 Mass at 342, 798 NE2d at 969 [“Here, no one argues that striking down the marriage laws is an appropriate form of relief’].) Thus, this court must construe the Domes *496 tic Relations Law in such a way as to cure its current constitutional defect.[40] Accordingly, the words “husband,” “wife,” “groom” and “bride,” as they appear in the relevant sections of the Domestic Relations Law, are and shall be construed to mean “spouse,” and all personal pronouns, as they appear in the relevant sections of the Domestic Relations Law, are and shall be construed to apply equally to either men or women.
IV Summary
It was only less than 40 years ago that the United States Supreme Court held that anti-miscegenation statutes, adopted to prevent marriages between persons solely on the basis of racial classification, violate the Constitution because they infringed on the freedom to marry a person of one’s choice. Similarly, this court must so hold in the context of same-sex marriages.
Marriage is, without a doubt, the cornerstone of the family and our civilization. (Zablocki, 434 US 374 [1978].) As marriage constitutes the most intimate of relationships (Griswold v Connecticut, 381 US at 486), the decision of whom and when to marry is highly personal, involving complex reasons which vary from individual to individual. Thus, the decision to marry should rest primarily in the hands of the individual, with little government interference. (See Cleveland Bd. of Educ. v LaFleur, 414 US 632, 639-640 [1974].) The Supreme Court has “routinely categorized the decision to marry as among the personal decisions that are protected by the right of privacy.” (Zablocki, 434 US at 384; Loving, 388 US at 12; Turner, 482 US at 95-96.)
Marriage provides an extensive legal structure that honors and protects a couple’s relationship, helps support the family and its children through an unparalleled array of rights and responsibilities, and privileges a married couple as a single *497 financial and legal unit. As discussed previously, notwithstanding that New York City same-sex couples may register as “domestic partners,” such benefits are relatively minimal compared to civil marriage. Plaintiffs’ inability to marry excludes them from the vast range of statutory protections, benefits, and mutual responsibilities automatically afforded to married couples by New York law and is unconstitutional for the foregoing reasons.
As a society, we recognize that the decision of whether and whom to marry is life-transforming. It is a unique expression of a private bond and profound love between a couple, and a life dream shared by many in our culture. It is also society’s most significant public proclamation of commitment to another person for life. With marriage comes not only legal and financial benefits, but also the supportive community of family and friends who witness and celebrate a couple’s devotion to one another, at the time of their wedding, and through the anniversaries that follow. Simply put, marriage is viewed by society as the utmost expression of a couple’s commitment and love. Plaintiffs may now seek this ultimate expression through a civil marriage.
Rote reliance on historical exclusion as a justification improperly forecloses constitutional analysis and would have served to justify slavery, anti-miscegenation laws and segregation. There has been a steady evolution of the institution of marriage throughout history which belies the concept of a static traditional definition. Marriage, as it is understood today, is both a partnership of two loving equals who choose to commit themselves to each other and a state institution designed to promote stability for the couple and their children. The relationships of plaintiffs fit within this definition of marriage.
Similar to opposite-sex couples, same-sex couples are entitled to the same fundamental right to follow their hearts and publicly commit to a lifetime partnership with the person of their choosing. The recognition that this fundamental right applies equally to same-sex couples cannot legitimately be said to harm anyone.
While, undeniably, religious institutions have a historical and spiritual interest in marriage and the recognition of those married under their tenets, ultimately it is the government’s choice as to which relationships to recognize as valid civil marriages and whether, and the degree to which, legal protections, burdens *498 and privileges should be conferred on that civil institution.[41] The court recognizes that this decision may cause pain to some in that their religious convictions forbid the recognition of same-sex marriage. However, the court emphasizes that government recognition that same-sex couples may be civilly married does not impact on those married under the tenets of their individual faith, and does not require that religious institutions change their tenets, nor their definition of marriage under their faith.[42] Moreover, such religious considerations cannot legally be the basis upon which to curtail the constitutional rights of plaintiffs.
Furthermore, that prejudice against gay people may still prevail elsewhere cannot be a legitimate justification for maintaining it in the marriage laws of this State. “Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.” (Palmore v Sidoti, 466 US 429, 433 [1984].)
Accordingly, it is hereby ordered that plaintiffs’ motion for summary judgment is granted; it is further ordered that defendant’s cross motion for summary judgment is denied; it is further adjudged and declared that the Domestic Relations Law violates article I, §§ 6 and 11 of the Constitution of this State; it is further adjudged and declared that the words “husband,” “wife,” “groom” and “bride,” as they appear in the relevant sections of the Domestic Relations Law, are and shall be construed to mean “spouse,” and all personal pronouns, as they appear in the relevant sections of the Domestic Relations Law, are and shall be construed to apply equally to either men or women; and it is further ordered that defendant is permanently enjoined from denying a marriage license to any couple, solely on the ground that the two persons in that couple are of the same sex.

. Affidavit of Curtis Woolbright ¶ 8, attached to affirmation of Susan Sommer submitted in support of plaintiffs’ motion for summary judgment, dated July 29, 2004.

. In a highly controversial decision, California’s Supreme Court was the first state court to declare its state’s anti-miscegenation statute, which barred whites from marrying “negroes, Mongolians, members of the Malay race, or mulattoes,” unconstitutional. (Perez v Sharp, 32 Cal 2d 711, 712, 198 P2d 17, 18 [1948].) It was not until almost two decades later, in Loving v Virginia (388 US 1 [1967]), that the United States Supreme Court struck down a similar anti-miscegenation law as unconstitutional. At that time, 16 states still had laws prohibiting interracial marriage. (<http://www.encyclopedia. thefreedictionary.com/miscegenation> [accessed Feb. 2, 2005], cached at <http://www.courts.state.ny.us/reporter/webdoes/Miscegenation_encyclopedia_article_about_Miscegenation.htm>.) Such laws were not completely repealed in individual states until November 2000, when Alabama became the last state to repeal its law, by 60% in favor of repeal. (Id.)

. See Kindregan, Same-Sex Marriage: The Cultural Wars and the Lessons of Legal History, 38 Fam LQ 427, 434-435 (Summer 2004); Ross, The Sexualization of Difference: A Comparison of Mixed-Race and Same-Gender Marriage, 37 Harv CR-CL L Rev 255 (2002).

. See, supra n 2.

. Affidavits from each plaintiff couple and family members are attached to the Sommer affirmation.

. Form letter attached to affirmation of Jeffrey S. Trachtman submitted in support of plaintiffs’ motion for summary judgment, dated July 29, 2004 (plaintiffs’ motion) as exhibit 3.

. Corporation Counsel Opinion (Corporation Counsel Op) attached to Trachtman affirmation as exhibit 3.

. 2004 Ops Atty Gen No. 12004-1, at 7-11 (Mar. 2004), attached to Trachtman affirmation submitted in support of plaintiffs’ motion as exhibit 4 (Atty Gen Op). The opinion concluded that “the Legislature did not intend to authorize same-sex marriage. This interpretation of the statute, however, raises constitutional concerns, which are best resolved by the courts of this State.” (Id. at 27.)

. Defendant expressly affirms that he “does not dispute the material facts set out by plaintiffs in their motion for summary judgment” (defendant’s brief at 1-2), thereby conceding the truth of all the operative facts set forth in plaintiffs’ opening brief and accompanying affidavits. In addition, defendant admits that “same-sex couples can establish committed, caring relationships and can be fine parents.” (Defendant’s brief at 2.) By not contesting plaintiffs’ contentions, defendant also concedes that plaintiffs’ exclusion from marriage deprives them of a vast range of statutory protections, benefits, and mutual responsibilities automatically afforded to married couples by New York law. (See mem of law in support of plaintiffs’ motion for summary judgment, dated July 29, 2004, at 14-23 [plaintiffs’ brief].)

. See, supra n 9.

. See, supra n 9.

. See plaintiffs’ brief at 18-19; affidavits of plaintiffs Reyes ¶ 14, Cohen ¶ 10, Shain ¶ 14, Abrams ¶ 22, and Robinson ¶¶ 21, 23, attached to Sommer affirmation.

. See, supra n 12.

. See plaintiffs’ brief at 24-25; see e.g. affidavit of plaintiff Elsasser ¶ 18: “As long as we cannot marry, we are not full citizens . . . We are still assigned the status of second-class citizens, for practical purposes and as a matter of basic dignity. Without the right to marriage itself, we are denied full respect and dignity for our families.”

. The informal opinion was at the request of the Corporation Counsel of the City of Cohoes and the Town Attorney of the Town of Olive.

. In a decision and order dated August 20, 2004, this court permitted State Senator Ruben Diaz, Sr., State Senator Raymond A. Meier, Assemblyman Daniel Hooker, Michael Long, the chairman of the Conservative Party, as the co-owner of a small business, and the New York Family Policy Council to *471 appear as amicus curiae, for the limited purpose of submitting a brief on the substantive motions. (Hernandez v Robles, 5 Misc 3d 1004[A], 2004 NY Slip Op 51179[U] [2004].)

. The opinions of the Surrogate’s Court and the Appellate Division in Matter of Cooper refer to the definition of a “surviving spouse” in EPTL 5-1.2 (a), which provides, in pertinent part, “(a) A husband or wife is a surviving spouse within the meaning, and for the purposes of . . . 5-1.1.” (Emphasis added.) Although the issue of the constitutionality of same-sex marriage was not before it, the Surrogate’s Court concluded, in dictum, that same-sex couples have no right to marry under New York law and that this does not violate the Constitution. (Matter of Cooper, 149 Misc 2d 282, 288 [1990].)

. The United States Supreme Court later dismissed the appeal in Baker v Nelson (409 US 810 [1972]). (See infra n 19.)

. To the extent that the Appellate Division addressed the State Constitution, such analysis was as applied to the EPTL and not squarely on the issue before this court. Further, such analysis was simply predicated on Baker v Nelson (supra), which only addressed the Federal Constitution. (See Matter of Cooper, 187 AD2d at 133-135.) Furthermore, the Attorney General has stated: “Baker v. Nelson no longer carries any precedential value with respect to the federal Equal Protection Clause . . . [Contemporary equal protection doctrine, which emerged several years after Baker v. Nelson, see e.g., Hogan, 458 U.S. at 724-26; Craig, 429 U.S. at 197, demands that the government demonstrate that a gender-based classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives . . . Moreover, only after Baker v. Nelson did the United States Supreme Court expressly hold that, even under rational basis review, moral disapproval of homosexuals as a class cannot be a legitimate government interest. See Romer, 517 U.S. at 635.” (Atty Gen Op at 21-22.)

. Further, the precedential value of Baker v Nelson has been called into question. (See, supra n 19.)

. Pursuant to this court’s May 14, 2004 order, and in accordance with CPLR 1012 (b) and Executive Law § 71, the Attorney General was notified of this action and given an opportunity to intervene in support of the constitutionality of the relevant statutes, but chose not to. In a letter dated June 14, 2004, the Attorney General asked that no inference be taken from his failure to intervene, and no inference has been taken by this court.

. Moreover, as plaintiffs argue with respect to claims under this State’s Constitution, federal constitutional jurisprudence may offer guidance, but is not necessarily dispositive. The state court, “in determining the scope and effect of the guarantees of fundamental rights of the individual in the Constitution of the State of New York ... is bound to exercise its independent judgment and is not bound by a decision of the Supreme Court of the United States limiting the scope of similar guarantees in the Constitution of the United States.” (People v Barber, 289 NY 378, 384 [1943]; see People v Harris, 77 NY2d 434, 437-438 [1991] [“Our federalist system of government necessar *474 ily provides a double source of protection and State courts, when asked to do so, are bound to apply their own Constitutions notwithstanding the holdings of the United States Supreme Court. . . Sufficient reasons appearing, a State court may adopt a different construction of a similar State provision unconstrained by a contrary Supreme Court interpretation of the Federal counterpart”]; see also, People ex rel. Arcara v Cloud Books, 68 NY2d 553, 557 [1986].)

. See also Zablocki v Redhail, 434 US at 384.

. See supra at 460-462 on Loving v Virginia.

. In Zablocki (supra), a Wisconsin statute had deprived petitioner of the right to obtain a marriage license due to his inability to pay outstanding child support obligations.

. Notably, in Onofre, the Court of Appeals was decades ahead of the "United States Supreme Court in recognizing the fundamental liberty interest at stake in private consensual sexual activity. Not until 23 years later, in Lawrence v Texas (539 US 558 [2003], supra), did the Supreme Court join New York in recognizing that the liberty to enter into intimate relationships with another is protected by the Federal Constitution (Texas prohibition on sexual relations between same-sex partners violates the Federal Constitution’s guarantee of liberty under the Federal Due Process Clause).

. See infra section II (D), “New York’s Evolving Commitment to Protect and Respect Same-Sex Relationships.”

. It has been observed that DOMA and the mini DOMAs may be vulnerable to legal challenge. In Langan v St. Vincent’s Hosp. of N.Y., the court indicated that it is not clear on what authority Congress, let alone states, can suspend or abrogate the Full Faith and Credit Clause of the United States Constitution. (196 Misc 2d at 445; see Sherrer v Sherrer, 334 US 343 [1948].)

. See, supra section II (A), “Disadvantages Suffered by Plaintiff Couples and Their Children.”

. Any claim by defendant that access to marriage be denied because of a possible backlash against gay people does not justify continued denial of constitutional rights. To the extent that defendant argues an “incremental” approach is preferable, rather than a vindication of plaintiffs’ rights, this seemingly suggests that such deprivation of the privileges of marriage is for their own good. This argument is similar to those asserted in Brown v Board of Educ. of Topeka, Shawnee County, Kan. (347 US 483 [1954]), in which the states argued to the Supreme Court that school segregation should continue for black children’s own good, predicting that desegregation would cause local and state governments to drastically defund integrated public systems; cause white children to move to private segregated schools, with no private options affordable to black children; and black teachers to be unemployable. (See e.g. brief for appellees [Virginia] at 30-31; Davis v County School Bd. of Prince Edward County, No. 191 [US Oct. 9, 1952] [attached to Trachtman reply affirmation, exhibit 27].) In Brown, the Supreme Court rejected these rationales as mere excuses to perpetuate discrimination.

. Into the 1980’s, at least one particularly egregious vestige of the archaic “definition” of marriage remained intact in this state. New York’s statutory “marital exemption” to the crime of rape, dating back to preColonial England, exempted a husband from prosecution for rape committed against a wife with whom he cohabited. The Court of Appeals ultimately exercised its constitutional role to declare the discrimination underlying the marital rape exception unacceptable under contemporary conceptions of marriage and constitutional rights. (People v Liberta, 64 NY2d at 163-164.) The Court of Appeals recognized that, in striking down the marital exemption, it was upsetting a long history and tradition. But it also recognized, like Justice Oliver Wendell Holmes, that history cannot save a rule of law that no longer has a rational basis in the modern world: “It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.” (Id. at 167, quoting Holmes, The Path of the Law, 10 Harv L Rev 457, 469 [1897].) First codified in New York in 1881 (see 1881 Penal Code, tit X, ch II, § 278), the marital exemption’s origins are “traceable to a statement made by the 17th century English jurist Lord Hale, who wrote: ‘[The] husband cannot be guilty of a rape committed by himself upon his lawful wife, for by their mutual matrimonial consent and contract the wife hath given up herself in this kind unto her husband, which she cannot retract.’ ” (People v Liberta, 64 NY2d at 162, quoting 1 Hale, History of Pleas of the Crown, at 629; see also People v Meli, 193 NYS 365, 366 [Sup Ct, Chautauqua County 1922].)

. The court upheld the validity of the Executive Order on the basis of equal protection principles that barred “arbitrary” and “invidious discrimination . . . Under this rubric, discrimination against homosexuals . . . based on their sexual preference raises significant constitutional questions under both prongs of our settled equal protection analysis.” (Under 21 v City of New York, 108 AD2d 250, 257 [1st Dept 1985], citing Rowland v Mad Riv. Local School Dist., 470 US 1009, 1014 [1985].)

. In modifying and affirming the Appellate Division in Under 21 v City of New York (108 AD2d 250 [1st Dept 1985], mod on other grounds 65 NY2d 344 [1985]), the Court of Appeals explicitly declined to decide the question as to whether differential treatment on the basis of sexual orientation is subject to “some level of ‘heightened scrutiny,’ ” on the grounds that an answer to it was not necessary to the disposition of the particular matter before the Court, noting, “We need not decide now whether some level of ‘heightened scrutiny’ would be applied to governmental discrimination based on sexual orientation.” (65 NY2d at 364.)

. Simmons and O’Connell, U.S. Census Bureau, Married-Couple and Unmarried Partner Households: 2000, at 2, 9 (2003) (Trachtman affirmation, exhibit 20).

. Although the SONDA law states explicitly that it is not to be construed to require or prohibit marriage rights for same-sex couples, it clearly evinces a public policy choice by the legislative and executive branches in favor of eliminating discrimination based on sexual orientation. (See Sexual Orientation Non-Discrimination Act, L 2002, ch 2, § 1 [“Legislative findings and intent”].)

. See, e.g., Administrative Code § 3-241 (2000); Municipal Code of City of Rochester § 47B-1 (available at <http://www.generalcode.com/ webcode2.html>, cached at <http://www.courts.state.ny.us/reporter/webdocs/ Creation_of_domestic_partnership.htm>).

. See Executive Order (Pataki) No. 113.30 (9 NYCRR 5.113) (surviving gay partners entitled to same benefits as spouses from State’s Crime Victims Board); September 11th Victims and Families Relief Act (L 2002, ch 73 [legislative intent section specifies that domestic partners should be eligible for September 11 federal fund awards]); Laws of 2002 (ch 467 [amending State’s Workers’ Compensation Law to provide same-sex domestic partners of September 11 victims same death benefits provided to spouses]); Laws of 2002 (ch 176 [same-sex domestic partners of September 11 victims and their children eligible for State’s World Trade Center Memorial Scholarship program]).

. See e.g. Laws of 2003 (ch 679 [enabling same-sex domestic partners of credit union members to become members and have full access to banking services]); 9 NYCRR 525.1, 525.2 (extending equal eligibility to Crime Victims Board benefit to all domestic partners of crime victims, not just September 11 victims).

. The Commonwealth of Virginia argued that the court “had no authority to evaluate the wisdom of Virginia’s race restriction in marriage, and that the social theories and research surrounding interracial marriage were too complex and controversial for judicial, rather than legislative review.” (Bonauto, Murray and Robinson, The Freedom to Marry for Same-Sex Couples: The Reply Brief of Plaintiffs Stan Baker et al. In Baker et al. v State of Vermont, 6 Mich J Gender & L 1, 40 n 143 [1999].)

. The remedy ordered in People v Liberta (supra) is instructive. There, the Court of Appeals determined that New York’s forcible rape statute violated equal protection because it applied to males who forcibly raped females, but exempted females from criminal liability for forcible rape of males. (People v Liberta, 64 NY2d at 170.) In assessing whether or not to strike down the law, the Court of Appeals looked to “the importance of the statute, the significance of the exemption within the over-all statutory scheme, and the effects of striking down the statute.” (Id. at 171.) Noting that forcible rape statutes were of “utmost importance” and that declaring “such statutes a nullity would have a disastrous effect on the public interest and safety,” the Court determined that the appropriate course of action was to “eliminate the exemptions” and “thereby preserve the statutes.” (Id. at 171-172.) The Court thus construed the statute in a gender-neutral fashion, striking the gender exception and interpreting the law to apply to all persons. (Id. at 172.)

. In declaring that “freedom means freedom for everyone” to enter “into any kind of relationship they want to,” Vice-President Cheney acknowledged that the issue is what kind of government recognition should be “granted ... to particular relationships.” (Toner, Cheney Stakes Out Stance on Gay Marriages, New York Times, Aug. 25, 2004, at 1, col 1.)

. Both the secular and religious nature of Domestic Relations Law has been recognized by the Court of Appeals: “Notwithstanding . . . civil divorce, plaintiff wife is not considered divorced and may not remarry pursuant to Jewish law, until such time as a Jewish divorce decree, known as a ‘Get’, is granted . . . [which] may be obtained . . . before a ‘Beth Din’, a rabbinical tribunal having authority to advise and pass upon matters of traditional Jewish law.” (Avitzur v Avitzur, 58 NY2d 108, 112 [1983], cert denied 464 US 817 [1983].)